1  BROOKE A. M. TAYLOR *(Pro Hac Vice)*
   btaylor@susmangodfrey.com
2  SUSMAN GODFREY L.L.P.
   1201 3rd Avenue, Suite 3800
3  Seattle, WA  98101
   Telephone:  (206) 373-7383
4  Facsimile:  (206) 516-3883

5  STEVEN G. SKLAVER (237612)
   ssklaver@susmangodfrey.com
6  AMANDA BONN (270891)
   abonn@susmangodfrey.com
7  DAVIDA BROOK (275370)
   dbrook@susmangodfrey.com
8  RAVI DOSHI (297851)
   rdoshi@susmangodfrey.com
9  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
10 Los Angeles, CA 90067-6029
   Telephone:  (310) 789-3100
11 Facsimile:  (310) 789-3150

12 Attorneys for Defendant Zillow, Inc.

13

14              **UNITED STATES DISTRICT COURT**

15             **CENTRAL DISTRICT OF CALIFORNIA**

16                    **SOUTHERN DIVISION**

17

| | |
|---|---|
| 18  IAN FREEMAN, an individual and as the representative of a class of similarly situated persons, | Case No. SACV 14-01843 JLS (DFMx) |
| 20                    Plaintiff, | DEFENDANT ZILLOW, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION |
| 21  v. | |
| 22  ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive | |
| 23 | Hearing Date:    February 5, 2016 |
| 24                    Defendants. | Hearing Time:    2:30 p.m. |
| | Courtroom:       10A |

25

26

27

28

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   FACTUAL BACKGROUND ....................................................................3

III.  ARGUMENT............................................................................................8

    A.   Plaintiff Cannot Prove Commonality, Typicality, Nor the More
        Demanding Predominance under Rule 23. ............................................8

        1.   Whether Each ISC Missed a Meal or Rest Break, and if
             So, Why, Cannot be Answered with Common Evidence............9

             a.   Individualized, Subjective Feelings about "Pressure" ......9

             b.   Individualized, Subjective Feelings about "Blitzes".......11

             c.   Individualized, Subjective Reactions to Free Lunches ...12

        2.   Questions Whether an ISC Worked OTC, Why, and
             Whether Zillow Knew or Should Have Known About It,
             Cannot Be Answered with Common Evidence. ........................15

             a.   No Common Timekeeping Practice ................................17

             b.   Individualized, Subjective Feelings of Work "Pressure" 19

    B.   Ascertainability, Manageability, and Superiority Are Lacking. ..........20

    C.   Plaintiff and His Counsel Cannot Adequately Represent a Class. .......22

        1.   As a *Former* ISC, Plaintiff Cannot Represent *Current*
             ISCs..........................................................................................22

        2.   The Releases Signed by Many Former ISCs—But Not
             Plaintiff—Preclude Certification of a Former-ISC
             Subclass..................................................................................22

        3.   Plaintiff and His Counsel Are Inadequate Due to The
             Appearance of Divided Loyalties. ............................................23

IV.   CONCLUSION ...........................................................................................25

1

2

TABLE OF AUTHORITIES

3 **<u>Federal Cases</u>**

4 *Alonzo v. Maximus, Inc.,*
       275 F.R.D. 513 (C.D. Cal. 2011) ....................................................... 23

5 *Am. Express Co. v. Italian Colors Rest.,*
       133 S. Ct. 2304 (2013) ...................................................................... 9

6
   *Amchem Prods., Inc. v. Windsor,*
7      521 U.S. 591 (1997) .......................................................................... 9

8 *Bacon v. Honda of Am. Mfg., Inc.,*
       205 F.R.D. 466 (S.D. Ohio 2001) ..................................................... 19

9 *Ballard v. Bank of Am.,*
       2013 WL 4807193 (C.D. Cal. Sept. 6, 2013) ..................................... 24

10 *Beal v. Lifetouch, Inc.,*
        2012 WL 3705171 (C.D. Cal. Aug. 27, 2012) ............................. 3, 26

11
    *Bernard v. Gulf Oil Corp.,*
12      841 F.2d 547 (5th Cir. 1988) ........................................................... 27

13 *Boerner v. Brown & Williamson Tobacco Co.,*
        394 F.3d 594 (8th Cir. 2005) ........................................................... 28

14 *Braun v. Safeco Ins. Co. of Am.,*
        2014 WL 9883831 (C.D. Cal. Nov. 7, 2014) ................................... 12

15 *Brinker Restaurant Corp. v. Superior Court,*
        53 Cal. 4th 1004 (2012) ............................................................. 1, 17

16
    *Buckland v. Maxim Healthcare Servs., Inc.,*
17      2012 WL 3705263 (C.D. Cal. Aug. 27, 2012) ................................ 11

18 *Campbell v. Best Buy Stores, L.P.,*
        2013 WL 5302217 (C.D. Cal. Sept. 20, 2013) ................................ 16

19 *Carlstrom v. DecisionOne Corp.,*
        217 F.R.D. 514 (D. Mont. 2003) ..................................................... 27

20 *Ciarlante v. Brown & Williamson Tobacco Corp.,*
        1995 WL 764579 (E.D. Pa. Dec. 18, 1995) ..................................... 27

21
    *Collins v. ITT Educ. Servs.,*
22      2013 WL 6925827 (S.D. Cal. July 30, 2013) .................................. 19

23 *Ellis v. Costco Wholesale Corp.,*
        657 F. 3d 970 (9th Cir. 2011) ......................................................... 25

24 *Flores v. Supervalu, Inc.,*
        509 F. App'x 593 (9th Cir. 2013) .................................................... 12

25 *Garcia v. Sun Pac. Farming Co-Op,*
        2008 WL 2073979 (E.D. Cal. May 14, 2008) *aff'd,*
26      359 F. App'x 724 (9th Cir. 2009) .................................................... 15

27 *Green v. Federal Express Corporation,*
        614 Fed. App'x 905 (9th Cir. 2015) ................................................ 19

28

*In re AutoZone, Inc. Wage and Hour Emp't Prac. Litig.*,
  289 F.R.D. 526 (N.D. Cal. 2012) ...................................................................19

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) .......................................................................23

*Jimenez v. Domino's Pizza, Inc.*,
  238 F.R.D. 241 (C.D. Cal. 2006) ...................................................................24

*Kayes v. Pacific Lumber Co.*,
  51 F.3d 1449 (9th Cir. 1995) ...........................................................................3

*Kilbourne v. Coca–Cola Co.*,
  2015 WL 5117080 (S.D. Cal. July 29, 2015)................................................19

*Koike v. Starbucks Corp.*,
  378 F. App'x 659 (9th Cir. 2010)...................................................................22

*Lightbourne v. Printroom, Inc. et al.*,
  307 F.R.D. 593 (C.D. Cal. 2015) ...................................................................25

*Lindsey v. Normet*,
  405 U.S. 56 (1972) .........................................................................................24

*Lou v. Ma Labs., Inc.*,
  2014 WL 68605 (N.D. Cal. Jan. 8, 2014) .....................................................28

*Melong v. Micronesian Claims Comm'n*,
  643 F.2d 10 (D.C. Cir. 1980) .........................................................................27

*Mendez v. R+L Carriers, Inc.*,
  2012 WL 5868973 (N.D. Cal. Nov. 19, 2012)...............................................11

*Munoz v. Giumarra Vineyards Corp.*,
  2012 WL 2617553 (E.D. Cal. July 5, 2012) ..................................................15

*Nguyen v. BDO Seidman LLP*,
  2009 WL 7742532 (C.D. Cal. July 6, 2009) ..................................................25

*Officemax of North America*,
  2012 WL 5473764 (C.D. Cal. Nov. 5, 2012) .................................................23

*Ordonez v. Radio Shack, Inc.*,
  2013 WL 210223 (C.D. Cal. Jan. 17, 2013)...................................................16

*Ordonez v. Radio Shack, Inc.*,
  2014 WL 4180958 (C.D. Cal. Aug. 15, 2014) ...............................................13

*Pedroza v. PetSmart, Inc.*,
  2013 WL 1490667 (C.D. Cal. Jan. 28, 2013) ................................................11

*Richie v. Blue Shield of Cal.*,
  2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) .................................................22

*Rodriguez v. Taco Bell Corp.*,
  2014 WL 5426733 (E.D. Cal. Oct. 23, 2014) ................................................16

*Rodriguez v. W. Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009).........................................................................29

*Stiller v. Costco Wholesale Corp.*,
  298 F.R.D. 611 (S.D. Cal. 2014)....................................................................19

*Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*,
  2014 WL 5033219 (C.D. Cal. Sept. 22, 2014)................................................3

4037007v1/014495

*Ugas v. H&R Block Enters. LLC,*
  2012 WL 5230297 (C.D. Cal. July 9, 2012) ......................................................10

*Walker v. Life Ins. Co. of the Southwest,*
  2012 WL 7170602 (C.D. Cal. Nov. 9, 2012).......................................................26

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011) ..................................................................................1, 9

*York v. Starbucks Corp.,*
  2011 WL 8199987 (C.D. Cal. Nov. 23, 2011) ....................................................19

**<u>Statutes</u>**

Cal. Labor Code § 1194 ..........................................................................................21

**<u>Rules</u>**

Fed. R. Civ. P. 23(a)(2) ............................................................................................8

Fed. R. Civ. P. 23(a)(3) ............................................................................................8

Fed. R. Civ. P. 23(a)(4) ............................................................................................8

**<u>Other Authorities</u>**

1 McLaughlin on Class Actions § 4:18 ..................................................................23

1 McLaughlin on Class Actions § 4:39 ..................................................................24

iv

## I.    **INTRODUCTION**

None of Plaintiff's supposed common proof for his meal and rest break, "off the clock" ("OTC") work, and derivative claims is capable of generating "common *answers* apt to drive resolution of the litigation" in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Plaintiff's motion completely ignores that current and former Zillow Inside Sales Consultants ("ISCs") have testified about their widely divergent workplace experiences over the years with different timekeeping systems, different small teams run by at least 17 different managers with different management styles and requirements, different personal choices regarding when and where to eat lunch and take rest breaks, and different day-to-day choices regarding recording overtime or working OTC (or neither). Exs. 1-31.[1]

Because an employer is only required to "authorize and permit" rest periods and to "provide" but not "police" meal breaks, *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1028, 1040 (2012), the driving force in resolving Plaintiff's break claims will be the individualized inquiries necessary to *answer* (1) whether any particular ISC, on any particular day, skipped any break, and (2) if so, was this due to choice or coercion? In an office environment where some ISCs took frequent smoke breaks and others did not, where some ate lunch at nearby food trucks and others drove to restaurants, and where still others played ping pong or watched television in Zillow's breakroom, such common answers do not exist.

Similarly, because liability for OTC overtime "is contingent on proof [Zillow] knew or should have known off-the-clock work was occurring," *id.* at 1051, the driving force in resolving Plaintiff's OTC overtime claims will be the individualized inquiries necessary to *answer* (1) whether any particular ISC, on any particular day, worked any unrecorded time and (2) if so, why and whether Zillow

---

[1] Exhibits 1-60 are attached to the Declaration of Amanda K. Bonn, Exhibits 61-126 are attached to the Declaration of Mackenzie Powell, and Exhibits 127-217 are attached to the Declaration of Ryan Blackbourn.

1  knew or should have known about it? But in a workplace where some ISCs had

2  young children and never worked more than 8 hours, others worked overtime,

3  recorded it, and were paid for it, and still others testified that when they did work

4  OTC, there was no way their managers could have known about it, such common

5  answers again do not exist.

6      Although Plaintiff asserts that Zillow has "identical policies affecting

7  employees in identical ways," (Mot. at 2), the many dissimilarities in ISCs' day-to-

8  day experiences refute this unsupported assumption. Plaintiff's only supposed

9  "common" proof consists of his own individualized, anecdotal experiences and

10 those of six other former ISCs, all of whom have also separately sued Zillow, and

11 all of whom are represented by the same law firms seeking to represent the putative

12 class. But even these six declarants had different experiences from each other,

13 Plaintiff, and the 31 declarants submitted in opposition. As explained by expert Dr.

14 Ted Anderson, a Ph.D. in economics from UCLA specializing in labor economics,

15 Plaintiff's proposed methodology is unreliable, and extrapolating the experiences

16 from Plaintiff's cherry-picked declarants to the putative class is scientifically

17 unsound. Anderson Decl. ¶¶1-2, 14-20.

18     Plaintiff is also an inadequate class representative. Plaintiff, unlike current

19 ISCs, lacks standing to seek injunctive relief because he is a former ISC. Permitting

20 Plaintiff to represent current ISCs would therefore impermissibly split absent class

21 members' claims and cause them adverse *res judicata* consequences—a fact that

22 this Court has repeatedly held precludes certification. *See, e.g., Tigbao v. QBE Fin.*

23 *Inst. Risk Servs., Inc.*, 2014 WL 5033219, at *2 (C.D. Cal. Sept. 22, 2014) (Staton,

24 J.); *Beal v. Lifetouch, Inc.*, 2012 WL 3705171, at *4 (C.D. Cal. Aug. 27, 2012)

25 (Staton, J.). Plaintiff cannot cure this inadequacy by seeking to represent only a

26 subclass of former ISCs because a significant number of them—but not Plaintiff—

27 signed contracts that *released* the claims asserted here. Exs. 61-126 (the

28

2

"Releases"). The Releases provide that if those former ISCs breach the contracts, they must return their severance payments, pay Zillow's attorneys' fees and costs, and indemnify Zillow. Plaintiff's motion, if successful, will therefore have devastating consequences for these former ISCs, and Plaintiff's willingness to expose them to that liability—all for the sake of hoped-for class treatment—makes him inadequate.

Plaintiff's counsel are also inadequate due to their dual-role here and representing other ISCs in separate lawsuits against Zillow asserting wrongful-termination and other claims (the "Individual Lawsuits"). Exs. 32-35. Plaintiff's counsel seeks $150+ million in compensatory damages, plus punitive damages, in the Individual Lawsuits, amounts vastly exceeding the potential recovery here. Exs. 44-47. This simultaneous representation and economic competition across the actions at a minimum creates an appearance of divided loyalties, thereby rendering Plaintiff's counsel inadequate. "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (quotation omitted).

Despite numerous obstacles to class certification under Rule 23 and Zillow's Due Process rights, Plaintiff's motion ignores them.[2] The motion should be denied.

## II.   FACTUAL BACKGROUND

Zillow operates the leading online and mobile real estate and home-related information marketplaces. California ISCs secure new business and sell online advertising to real estate professionals, grow their revenue base by identifying leads and closing new business, and provide customer service and relationship management to existing clients. Ex. 49.

---

[2] Plaintiff also failed to meet-and-confer, in violation of Local Rule 7-3. Bonn Decl. ¶4. Instead, he contends the rule is satisfied because the "parties were aware that this motion would be brought." Plf's Notice of Mot. (Dkt. 52) at iii.

ISCs were divided into "teams" of approximately 5-10 ISCs per manager. Ex. 37 (Freeman Dep. 57:12-21). Each manager had discretion in managing schedules, though ISCs were generally expected to work a 9-hour shift, including 8 paid hours and a 1-hour unpaid lunch. *See, e.g.*, Exs. 127, 210. ISCs were paid on a salary plus commission basis. Ex. 37 (Freeman Dep. 9:4-7). Over time, Zillow ISCs have had varying productivity metrics, including quotas and talk time requirements. ISCs' experiences with such productivity metrics varied person-to-person, team-to-team, and day-to-day.[3]

Zillow maintains in its breakroom posters and wage orders published by the California Industrial Welfare Commission, which set forth California law on meal breaks, rest breaks, and overtime. Ex. 38 at 15, 17. Managers are responsible for conveying expectations regarding breaks and hours to their teams. *Id.* The 31 ISCs from whom Zillow collected declarations reported to 17 different managers and whose management styles, scheduling, and approach to breaks differed. Because "[e]ach manager has a different style in terms of how they run their team, the verbal messaging they deliver to ISCs, their system for maintaining accountability over performance metrics, and a number of other issues . . . each team of ISCs at Zillow can feel like a different office." Ex. 28 ¶17.[4]

ISCs' practices regarding breaks varied person-to-person and day-to-day. Some took 1-hour lunches. Exs. 3 ¶9 ("And I usually take a full hour."); 8 ¶11 ("It has always been encouraged here at Zillow to take an hour lunch."); 28 ¶5 ("I would generally take an hour lunch break.").[5] Others preferred to take multiple, shorter breaks throughout the day. Exs. 18 ¶9 ("I try to take a 30-minute lunch break outside the building. . . . Sometimes I probably take less . . . . But again,

---

[3] *See, e.g.*, Ex. 3 ¶13; 4 ¶¶3, 9, 11; 7 ¶5; 8 ¶10; 11 ¶7; 12 ¶18; 13 ¶7; 15 ¶12; 16 ¶10; 18 ¶13; 21 ¶10; 23 ¶6; 24 ¶¶7, 16; 25 ¶5; 26 ¶12; 28 ¶10; 31 ¶9.
[4] *See also, e.g.*, Exs. 4 ¶14; 6 ¶12; 13 ¶7; 19 ¶6.
[5] *See also, e.g.*, Exs. 4 ¶13 ("hour long" lunches); 5 ¶5 (lunch at "12 p.m. or 12:30 p.m." for "[e]ither 30 minutes or an hour"); 22 ¶8 ("generally took a full 1 hour lunch break").

4

that's just my choice, no one tells me to do it that way."); 31 ¶7 ("It would be impossible for me to know exactly how long my lunches were each day because every day was different . . . . [E]ven if I only took, say, a 30-minute lunch break, I had the freedom to take the other 30-minutes and break it up into smaller breaks throughout the day. And sometimes I would do that . . . .").

Some traveled off-campus to eat at restaurants, run errands, nap, or visit friends. Exs. 11 ¶10 (I "typically get food at the café in the lobby of this building, or go to Carl's Junior which is a short drive from the office. Sometimes I run personal errands as well during my lunch break or even take a nap . . . ."); 20 ¶9 ("It will be more likely an hour lunch break (rather than 30 minutes) if I choose to see a friend out of the office, which I sometimes do.").[6] Others ate with friends in Zillow's breakrooms, which have television, free food, and games. Ex. 27 ¶5 ("Sometimes we (me and other guys from inside sales) get our food and go to the game room—where a TV, ping pong table, and shuffle board are and will eat there. Sometimes it takes 10-15 minutes to get your food . . . but whatever it is, we then fill the remaining time in the game room eating and it lasts in total between 30 minutes and an hour.").[7] Still others ate at their desks, by choice. Ex. 2 ¶9 ("A lot of times I would go grab lunch somewhere off [s]ite or in the cafeteria downstairs and then eat at my desk . . . but nobody ever told me I had to do that."); 17 ¶12 ("I eat at my desk because I am getting married in 4 months and so I do not want to eat outside at restaurants. I bring in my lunch every day because it's healthier.").[8]

---

[6] *See also* Exs. 12 ¶8 (off-campus "lunch for an hour" plus "15 minutes" of travel time each way "three out of five days" a week); 14 ¶4 ("started going home more often for lunch" for "a full hour" under "second manager"); 16 ¶7 ("hour lunch" to "go to my gym"); 19 ¶4 ("hour long lunches" to "go on walks with [former ISC, now manager] Karen Han").
[7] *See also* Exs. 24 ¶9; 12 ¶20.
[8] *See also* Exs. 7 ¶6 ("There were times that I had lunch at my desk and if I did that, it was my choice."); 14 ¶4 (generally would "go grab lunch in the communal kitchen and eat there or at my desk" and would "not look at any work at that time"); 18 ¶8 ("used to grab a snack and eat at my desk" but "[n]obody here pressured me to do that" and "it would vary from day to day").

5

Many ISCs believe they could take as many rest breaks as needed, and their practices varied substantially, including for ISCs who smoke. Exs. 4 ¶5 ("I'm a smoker so I have always taken a lot of breaks."); 19 ¶5 ("I smoked clove cigarettes, which take longer to smoke than tobacco cigarettes, probably about 20 minutes to finish a cigarette. And I would take 3 or 4 of those breaks throughout the day in addition to my lunch break."); 29 ¶1 ("In terms of rest breaks, I personally feel that I have the freedom to take however many rest breaks I need to. . . . I usually take 3-4 rest breaks per 8-hour workday. Usually my rest breaks are around 10 minutes.").[9]

Plaintiff claims one timekeeping system automatically entered an 8-hour workday with no opportunity for ISCs to report overtime. (Mot. at 3.) But numerous ISCs report that this "ADP" timekeeping system did permit them to modify their hours worked and that they knew how to do so if they worked overtime. Exs. 1 ¶¶13, 15 ("There was a process that you could log in. I think when I started, we had ADP or something like that, and I could log in and I knew how to log in. . . . Of course if I had been in the office longer than 8-5 pm, I would absolutely say something or feel free to log in to the system to change my time."); 7 ¶10 ("I had the ADP portal on my phone and desktop and went through ADP training."); 8 ¶17 ("I understood that I could change my time entries in ADP, so that if I worked longer than 8 hours in a day, I knew that I could change my time entries to reflect that."); 20 ¶12 ("Before Workday, it was the ADP portal, and I knew that I could adjust my time entries in ADP to reflect if I worked more than 8 hours. I knew that we could also use the phone portal (I think it was called Octa) for

---

[9] *See also* Exs. 9 ¶8 ("breaks whenever I feel like it," *i.e.*, "four smoke breaks a day"); 11 ¶11 (smoke breaks in "designated smoking section" and it's almost impossible to go downstairs, smoke, and be back in 15 minutes"); 18 ¶7 ("three to four 10 minute breaks" per day to "use a vaporizer" plus "a 30 minute lunch"); 22 ¶7 ("multiple breaks that I could take any time to walk around the building or check my cell phone"); 28 ¶8 (felt free "to take as many rest breaks as needed"); 30 ¶10 (chooses to skip rest breaks, but could take them "[i[f I wanted to"); 31 ¶5 ("never felt like there was a limit to how many breaks you could take or how long").

ADP to adjust our time entries if we worked overtime . . . .").[10] Plaintiff, however, claims he (1) *skipped* an ISC training session on ADP in early 2014, and (2) did not read the ADP training documents regarding logging overtime, even though he received and forwarded such documents to others. Exs. 37 (Freeman Dep. 60:12-61:9, 61:17-23; 71:13-80:9); 127; 211-213.

The timekeeping system later changed from ADP to Workday, which required ISCs to clock in and out for work and lunch. Exs. 6 ¶11 ("In terms of timekeeping, we have the Workday system. I tend to log my hours—start time, stop time, and lunch break start and stop time—at the end of the week.").[11] Plaintiff has *never even heard* of Workday, which was implemented after he left Zillow. Ex. 37 (Freeman Dep. 56:14-57:4; 84:21-86:13). Numerous ISCs testified that they never worked any overtime and never felt pressured to do so. Exs. 1 ¶15 ("Of course if I had been in the office longer than 8-5 pm, I would absolutely say something or feel free to log in to the system to change my time."); 15 ¶4 ("I love this company and I never felt pressured to skip breaks or work unpaid overtime."); 17 ¶8 ("I do not believe that I am owed any unpaid overtime. I never worked a 10 or 12 hour day or anything like that. With my miniature breaks, my total work day accumulates to 8 hours."); 27 ¶13 ("I have never worked longer than 8 hours in a day and was never pressured to do that or punished for leaving work after 8 hours.").[12]

Other ISCs think they may have worked OTC occasionally, but chose not to record the time and don't believe their managers could have known about it. Exs. 8 ¶18 ("There were a handful of times that I worked off the clock, and that was my choice. No one ever told me to do so. In 2014, when I chose to work off the clock, my managers wouldn't have known about it at least for me."); Exs. 23 ¶4 (took

---

[10] *See also* Exs. 23 ¶9; 28 ¶15.
[11] *See also* Exs. 1 ¶16; 5 ¶10; 18 ¶10; 28 ¶16.
[12] *See also* Exs. 14 ¶¶6-7 (generally worked 7 am to 4 pm with "a full hour lunch"); 28 ¶5 ("often" worked "6:30 a.m. and left by around 3:30 p.m." with "an hour lunch break"); 31 ¶7 ("generally worked 8 hours" excluding "lunches and breaks").

"extra breaks" and as a result "I don't think my manager knew or could tell if I worked an extra 5 or 10 minutes"); 29 ¶16 ("Sometimes I probably stayed longer than 8-hours. I don't really know if my manager knew how much I was working on a given day because there's a lot of freedom to take whatever breaks you need, get up and leave your desk and come back, and I wouldn't feel the need to tell my manager."). Still others have reported and been paid for overtime. Anderson Decl. ¶24 & Table 1 (overtime payments to declarant ISCs across 178 pay periods).[13]

## III.   ARGUMENT

To justify a departure from the "usual rule that litigation is conducted by and on behalf of the individual named parties only," a proposed class representative must prove he is "part of [a] class and 'possess the same interest and suffer the same injury' as the class members." *Dukes*, 131 S. Ct. at 2550. Thus, the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), class representatives must "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and "common" questions, must "predominate" over individual ones, Fed. R. Civ. P. 23(a)(2) (b)(3). These "stringent requirements . . . exclude most claims," including Plaintiff's. *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013).

### A.   Plaintiff Cannot Prove Commonality, Typicality, Nor the More Demanding Predominance under Rule 23.

Plaintiff fails to show how his meal and rest break, OTC, and derivative claims can be answered on a classwide basis without devolving into fact-specific, individualized inquiries. Plaintiff's discussion of commonality, typicality, and predominance is cursory, parroting "common questions" that ask whether a legal violation has occurred and asserting that uniform classwide experience exists based

---

[13] *See also, e.g.*, Exs. 6 ¶11 (manager "is constantly telling me to enter overtime"); 8 ¶17 ("I could change my time entries in ADP" so, "if I worked longer than 8 hours . . . I could change my time entries to reflect that."); 20 ¶¶8, 12 ("I knew that I could adjust my time entries in ADP to reflect if I worked more than 8 hours" and "would be paid overtime" if I "received a phone call 2 minutes before my 8 hours" and the call ran long).

on a handful of declarants' experiences and three emails—all but one of which were sent by a *single* manager to his small team of 5-10 ISCs. Ex. 37 (Freeman Dep. 57:12-21). But what "matters to class certification is not the raising of common questions—even in droves—but rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the *resolution of the litigation*." *Dukes*, 131 S. Ct. at 2551 (quotation marks and citations omitted) (emphasis added). Predominance under Rule 23(b)(3) is even more stringent. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Plaintiff fails to meet these standards.

### 1. Whether Each ISC Missed a Meal or Rest Break, and if So, Why, Cannot be Answered with Common Evidence.

Plaintiff offers no classwide method of determining whether, when, and why putative class members *actually* missed a break. An "individualized inquiry" rather than written "policies" will answer the "relevant question for purposes of certification" which is "when an employee worked through a meal period, was it because defendant[] failed to provide that employee with an opportunity to do so, or was it because the employee voluntarily chose to work through the meal period for any number of reasons?" *Ugas v. H&R Block Enters. LLC*, 2012 WL 5230297, at *5 (C.D. Cal. July 9, 2012).

Plaintiff asserts that there is common evidence based on:

- Anecdotal experiences of a handful of former employees, all of whom (except Plaintiff) have separately sued Zillow;

- Two cookie-cutter declarations stating "blitzes" required the declarants "to work consistently for roughly one hour" without breaks; and

- One email sent by one supervisor in September 2012 about optional *free* meals on-site, an email that was interpreted differently by ISCs who actually saw it and that was never seen by later-hired ISCs.

These theories fail to prove commonality, typicality, or predominance.

#### a. Individualized, Subjective Feelings about "Pressure"

Plaintiff's declarants report varying experiences when compared to one another and to the 31 other declarants—let alone when compared to their own

9

emails from their time at Zillow.[14] *Compare* Freeman ¶¶5-6 (referencing "general attitude and undertone of management" and communications with manager "Edward Cornelius[]"); *with* Kerr ¶6 (stating he "rarely took lunch breaks" without explaining *why*); Boehler ¶¶5, 7 (breaks ramped up from "rarely" during the "first 6 to 9 months" of employment to "a full one-hour lunch break" every day in 2015). Numerous other ISCs, however, never felt any pressure to skip lunch and perceived a different "general attitude and undertone" of management that Plaintiff sensed. Exs. 8 ¶11 ("It has always been encouraged here at Zillow to take an hour lunch."); 20 ¶4 ("I have never been forced to miss a meal or rest break by [managers] Sammy or Ed. . . . ."); 26 ¶10 ("There were never days here that I felt I could not take a break."); 28 ¶6 ("I never felt pressured by my manager to skip lunch."); 29 ¶12 ("I never felt pressured to skip lunch or breaks. . . ."); *see also supra* at 4-6 & n. 4-8

It is a "major error" to "provid[e] evidence only of specific instances to establish that Defendant has a particular policy or practice." *Buckland v. Maxim Healthcare Servs., Inc.*, 2012 WL 3705263, at *7 (C.D. Cal. Aug. 27, 2012) (Staton, J.). That is because "under *Dukes*, for anecdotal evidence to give rise to an inference of a common practice, the evidence should be representative. . . ." *Pedroza v. PetSmart, Inc.*, 2013 WL 1490667, at *8 (C.D. Cal. Jan. 28, 2013); *see also*, *Mendez v. R+L Carriers, Inc.*, 2012 WL 5868973, at *13 (N.D. Cal. Nov. 19, 2012) (plaintiff's discussion of "nineteen drivers" failed to establish that they "constitute a representative cross-section of all linehaul drivers in California or that these drivers were forced to skip breaks for similar reasons"). Plaintiff's handful of conclusory declarations is statistically unreliable, biased, and not representative. Anderson Decl. ¶¶14-20.

Courts within the Ninth Circuit have refused to find commonality satisfied in

---

[14] For a selection of Ms. Kremer's emails about taking lunch and breaks (including before, during, and after blitzes), see, for example, Exs. 137-43, 146-52, 155-57, 59-60, 165, 169-73, 175-208. Mr. Boehler sent and received similar emails. *See* Exs. 145-46, 154-55, 159, 162-65, 167-70.

similar circumstances. *See, e.g.*, *Flores v. Supervalu, Inc.*, 509 F. App'x 593, 594 (9th Cir. 2013) (no commonality where claim that "demeanor of some supervisors implicitly compelled employees to forego or interrupt breaks" required "examination of a number of human factors and individual idiosyncrasies having little to do with an overarching policy") (quotation marks omitted); *Braun v. Safeco Ins. Co. of Am.*, 2014 WL 9883831, at *16 (C.D. Cal. Nov. 7, 2014) ("Because of the putative class members' varying experiences, the meal and rest break claims are not readily susceptible to common proof.").

### b. Individualized, Subjective Feelings about "Blitzes"

Plaintiff also points to blitzes as alleged common evidence through two cookie-cutter declarations which state that "[e]ven if I already worked eight hours or had not taken any lunch or rest breaks, I would be required to stay and work for the duration of the blitz."[15] Kremer ¶8 & Peterson ¶8. According to Plaintiff, a blitz is a "period of focused selling activity" by ISCs that generally last an hour. Ex. 37 (Freeman Dep. 49:11-21; 51:23-25). Plaintiff contends that blitzes may occur between one and five times per day; are initiated by managers or ISCs; and can include either the entire office, just the team, or a handful of ISCs. *Id.* at 49-53.

ISCs' experiences with blitzes varied widely. Some reported that they "absolutely did not have to be present for a particular blitz." Ex. 3 ¶15. Some reported participating in hour-long blitzes at 8:30 a.m. and again at 1:30 p.m., meaning they could still take lunch "before 1:00 pm" and "rest breaks whenever." Ex. 29 ¶17. Others "blitzed" at different times entirely. Lanza ¶11 (claiming blitzes occurred at 10 a.m. and 2 p.m.). Unlike Kremer and Johnson, other ISCs "never felt like [b]litzes interfered with" their "lunch or rest breaks." Ex. 16 ¶11; Ex. 31 ¶6. The questions that will drive the resolution of Plaintiff's break claims are whether

---

[15] Ms. Kremer's declaration is belied by her emails, which show that blitzes did not interfere with her ability to take breaks. *See, e.g.*, Exs. 157 ("Smoke before the blitz?"), 171 ("I need another smoke after this blitz"), 180-83, 195-96, 205, 208 ("I need a break before this blitz").

1   any particular blitz, on any particular day, initiated by any particular person,
2   interfered with any particular ISC's ability to take a break. Because the answers to
3   these questions vary person to person, manager to manager, team to team, and day
4   to day, a flood of individualized inquiries predominates. *See also Ordonez v. Radio*
5   *Shack, Inc.*, 2014 WL 4180958, at *5 (C.D. Cal. Aug. 15, 2014) (denying
6   certification where "Plaintiff has not proffered a viable method of determining
7   when (or if) a particular employee took a rest break on a particular day, short of
8   obtaining testimony regarding each [] store and each [] employee").

9                    *c.    Individualized, Subjective Reactions to Free Lunches*

10          Plaintiff next relies on a single email from 2012, not even received by
11   putative class members hired in 2013-2015,[16] to try to prove a common policy of
12   depriving class members of meal breaks. As shown by the vastly dissimilar
13   reactions to the email by ISCs (who knew about it), the email does not require
14   anyone to skip lunch. Instead, a manager asked those who choose to take their
15   lunch-breaks offsite not to *also* take the free lunch provided for on-site.  *See,*
16   Freeman Ex. A. ("It is not ok to grab the lunch provided and then leave the office
17   for an hour break at lunch time—this defeats the purpose.").

18          Plaintiff did not even interpret this email as requiring him to skip lunch or
19   stay on the premises when he first received it. To the contrary, approximately two
20   hours after receiving this email, Plaintiff wrote to a friend that Zillow had brought
21   in "tri-trip steak & something else awesome" for lunch, that he was "*debating*
22   whether or not to skip [his] workout for free food," and that he thought "the food
23   may win out but [he] needed to shake the cobwebs still."[17] Exs. 37 (Freeman Dep.
24   65-67); 132. Plaintiff claims even after receiving the catered lunch email, whether
25   he "felt comfortable nevertheless leaving the office" varied on a "case by case"

26   _____
27   [16] *See, e.g.*, Exs. 1-9, 12-14, 16-18, 20-22, 24-27, 29-31.
     [17] Plaintiff's declarants Ms. Kremer and Mr. Boehler also ate off-campus rather
28   than taking the catered lunch. *See, e.g.*, Ex. 147, 164.

                                          12

1   basis and could "depend on a variety of factors including how close to target [he

2   was] that month, how close to the end of the month it was, or other elements of the

3   job," as well as his perception of the "general attitude" at Zillow. Ex. 37 (Freeman

4   Dep. 64-65). Indeed, Plaintiff admits that while he initially believed he could leave

5   the catered lunch and go work out instead, his "understanding about lunches may

6   have changed over time" as he "became more senior and quotas ramped up" and he

7   perceived other information about the supposed "culture" at Zillow. *Id.* (Freeman

8   Dep. at 69). The Supreme Court has rejected such "corporate culture" theories of

9   commonality. *Dukes*, 131 S. Ct. at 2553-54.

10          Other ISCs agree that they did not respond to Zillow's provision of an

11  optional, free lunch as somehow forcing them to skip lunch breaks. *See, e.g.,* Ex. 15

12  ¶8 ("And the company is really good about bringing in lunch. . . .  I never felt that I

13  was required to stay here in the building and eat the lunch."); Ex. 20 ¶10 ("If the

14  company provides lunch, I sometimes take it and I can eat that lunch anywhere I

15  want to and am not required to work then – the company catered lunch is a full

16  lunch provided for me and I will take an additional 30 minute lunch break even

17  after that if I eat that free lunch in the office."); Ex. 21 at ¶7 ("Sometimes I'll eat

18  the catered lunch.  Sometimes I'll go to the cafeteria downstairs. Sometimes I'll

19  drive to a nearby restaurant. It usually depends on whether or not the catered food

20  looks good on any given day."); Ex. 26 at ¶6 ("Most people that I've seen take the

21  catered lunch and go outside to the picnic tables to eat.").[18]

22          Given ISCs' widely divergent experiences on all of these issues, Plaintiff has

23

24  _____

    [18] *See also* Exs. 3 ¶8 (catered lunch "never made me feel pressure to skip my actual
    lunch break"); 16 ¶12 ("I rarely go up to eat the catered lunches and have never felt
25  any pressure to do so."); 7 ¶11 (catered lunch "did not have to be a working
    lunch");  8 ¶12 ("I have never believed that I had to eat the catered lunch while we
26  work at our desk" and "on most days" takes it "as a full dedicated lunch in the
    lunch room"); 9 ¶9; 22 ¶8; 24 ¶10; 25 ¶3; 29 ¶10 (I "could grab some food, and still
27  leave and take my lunch break outside of the building if I wanted to run an
    errand"); 30 ¶5 ("you do not have to work through your lunch ever" including "if I
28  choose to get the free lunch," and saying otherwise "is ridiculous").

                                             13

not shown his experience regarding meal and rest breaks is typical. *Munoz v. Giumarra Vineyards Corp.*, 2012 WL 2617553, at *28 (E.D. Cal. July 5, 2012) (holding no typicality where "declarants provide differing accounts of what *actually* was required by the differing practices of its foreman"); *Garcia v. Sun Pac. Farming Co-Op*, 2008 WL 2073979, at *13 (E.D. Cal. May 14, 2008), *aff'd*, 359 F. App'x 724 (9th Cir. 2009) (holding plaintiff's "claims are typical of **some** of the proposed class members but *a*typical of other of the proposed class members").

Nor can Plaintiff establish commonality or predominance, as the *answers* necessary to resolve the meal break claims will depend on a substantial number of individualized inquiries into (1) whether each ISC ever received, read, or was otherwise aware of the email, (2) how she interpreted the email, (3) whether on any particular day, Zillow provided a free lunch, (4) whether on that particular day, the particular ISC chose to stay on premises and eat the food or go elsewhere for lunch (or run other errands), (5) whether, if the ISC chose to stay on premises to eat the free food, she also involuntarily worked through her lunch.[19] "Rather than demonstrating the existence of a uniform policy of depriving employee[s] of their meal [or rest] breaks," the evidence here "presents numerous possibilities as to *why* certain employees may have had a late, short, or missed meal [or rest] break during a given shift." *Ordonez v. Radio Shack, Inc.*, 2013 WL 210223, at *8 (C.D. Cal. Jan. 17, 2013). Even if it were true that "*some* [ISCs] experienced pressure from their supervisors to miss breaks . . . some [ISCs] did not." *Campbell v. Best Buy Stores, L.P.*, 2013 WL 5302217, at *13 (C.D. Cal. Sept. 20, 2013). "As a result, resolving the questions whether [ISCs] missed breaks . . . as well as the reason why any particular [ISC] did so, will necessarily involve individualized inquiries." *Id.*

---

[19] *See, e.g.*, *Rodriguez v. Taco Bell Corp.*, 2014 WL 5426733, at *7 (E.D. Cal. Oct. 23, 2014) (holding "a 50% employee discount on food products conditioned upon the employee staying on premises does not transform a compliant meal or rest break into one that does not comply with the California Labor Code").

2.   Questions Whether an ISC Worked OTC, Why, and Whether Zillow Knew or Should Have Known About It, Cannot Be Answered with Common Evidence.

Plaintiff fails to satisfy Rule 23's requirements on his claim for unpaid overtime as a result of OTC work. To establish liability for OTC work, common evidence is required to prove (1) whether each ISC actually performed OTC work on any particular day and, if so, (2) why and whether Zillow knew or should have known about it – common proof that does not exist. *Brinker*, 53 Cal. 4th at 1051-52. Plaintiff provides no such common evidence.

While Plaintiff purportedly felt pressured to work OTC, a substantial number of other ISCs did not. Exs. 6 ¶10 ("I've never felt pressure to work overtime . . . ."); 17 ¶8 ("I do not believe I am owed any unpaid overtime . . . . With my miniature breaks, my total work day accumulates to 8 hours."); 27 ¶13 ("I have never worked longer than 8 hours in a day and was never pressured to do that or punished for leaving work after 8 hours.").[20] While Plaintiff claims his manager ordered him to work OTC, many other ISCs with different managers had radically different experiences. Exs. 5 ¶8 ("My manager has never told me that I need to work more than 8 hours a day."); 20 ¶7 ("Sometimes I asked [my manager] Sammy [Tyby] if I could stay longer than 8 hours to work and was told not to, and if so, then I would leave work.").[21]

Some ISCs say if they worked OTC, it was their personal choice and their managers had no way of knowing. Exs. 8 ¶18 ("[I]f I did" work "10 hour days," it

---

[20] *See, also* Exs. 9 ¶7 ("I've never felt any pressure to . . . come in early or stay late."); 18 ¶10 ("I never feel any pressure from anyone to under-report my time in Workday."); 28 ¶11 ("I don't think I ever really worked longer than 8 hours, factoring in my lunch break" and "didn't need to do that" to "hit my numbers, and generate high commissions"); 29 ¶12; 31 ¶7 ("never once felt pressured" to work OTC); *supra* at 7 & n. 11.

[21] *See, also* Exs. 1 ¶18 ("no one has ever told me that I can't have overtime if I worked it."); 3 ¶11 ("never observed any intimidation" to "work more than 8 hours"); 14 ¶7 ("Nobody at Zillow has ever told me that I needed to work more than 8 hours."); 15 ¶4 ("I never felt pressured to skip breaks or work unpaid overtime.").

15

was "because I took long breaks and I felt that I had to get an honest work day done so even when I was here for 10 hours, it was really because I was working 8 hours in total."); 19 ¶8 (manager "probably worked 7-and-a-half hour days" and "if she left at 4:00 p.m., she really had no way of knowing if people on her team were leaving on-time or if they were staying late because she was out of the office"); 29 ¶16 ("I never felt pressured by managers or anyone else that I had to work overtime.  Sometimes I probably stayed longer than 8-hours. I don't really know if my manager knew how much I was working on any given day because there's a lot of freedom to take whatever breaks you need, get up and leave your desk, and come back, and *I wouldn't feel the need to tell my manager whether I was working overtime*."); 31 ¶7 ("I feel like I generally worked 8 hours . . . . I suppose it's possible that on some days, maybe I cut my lunch short or something like that.  But if I did, it was totally my choice.  I'm not even sure how my managers could have known if I was doing that because everyone is constantly in and out and we have freedom to take our breaks whenever we want."). While Plaintiff claims he was not trained how to enter overtime in the timekeeping system because he *skipped* the training session, many other ISCs were trained, did so, and were paid overtime. Indeed, 26 of the ISCs who submitted declarations have been paid overtime. Anderson Decl. ¶24 & Table 1.

This wide variation in day-to-day experiences of different ISCs with different work habits, managers, and time entry practices renders certification inappropriate. The evidence shows that "even if some [ISCs] experienced pressure from their supervisors . . . not to report or request overtime, some [ISCs] did not," and that determining "whether [ISCs] . . . worked unreported overtime, as well as the reasons why any particular [ISC] did so, will necessarily involve individualized inquiries." *Campbell*, 2013 WL 5302217, at *13. Numerous cases have likewise denied certification of similar OTC claims. *See, e.g., Braun v. Safeco Ins. Co.*, 2014

1    WL 9883831, at *14-15 (C.D. Cal. Nov. 7, 2014) (denying certification of OTC

2    claims based on workload and alleged manager coercion).[22]

3          Indeed, the fact that Plaintiff contends that managers allegedly required OTC

4    work is itself reason to deny certification, because many of those managers were

5    once ISCs and are thus putative class members, creating an intra-class conflict.[23]

6    *See, e.g.*, *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 481-82 (S.D. Ohio

7    2001) (holding intra-class conflict defeats certification of proposed class that

8    includes members who "participate in employment decisions" and who would be

9    "in the conflicting position of having to defend their actions").

10                    a.    *No Common Timekeeping Practice*

11          Plaintiff nevertheless contends that his OTC claim should be certified

12   because "Zillow had a uniform corporate policy of recording an eight hour workday

13   for each class member—regardless of the hours actually worked." (Mot. at 15.)

14   This assertion is easily discredited, and even if true, would not satisfy Rule 23.

15          Zillow's timekeeping systems changed during the proposed class period. At

16   one point during Plaintiff's employ, Zillow implemented an ADP timekeeping

17   system. Exs. 127; 211-213. ISCs were provided with instructions on how to log-in

18   to the ADP system, and were instructed that if their "actual hours differ[ed]" from

19   the 8 hour default entry provided for, they would "need to override default entries,"

20   and were taught how to do so. Ex. 127. ISCs were also specifically instructed how

21   to use ADP to "record Overtime." Exs. 37 (Freeman Dep. 76-79); 211. While

22   Plaintiff claims he did not know how to adjust time entries in ADP, that's because

23   he is atypical – he did not read the ADP training documents he received, and he

---

24   [22] *See also Kilbourne v. Coca–Cola Co.*, 2015 WL 5117080, at *11 (S.D. Cal. July
     29, 2015) (citing *Green v. Federal Express Corporation*, 614 Fed. App'x 905 (9th
25   Cir. 2015)); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 628 (S.D. Cal.
     2014); *Collins v. ITT Educ. Servs.*, 2013 WL 6925827, at *5-7 (S.D. Cal. July 30,
26   2013); *In re AutoZone, Inc. Wage and Hour Emp't Prac. Litig.*, 289 F.R.D. 526,
     538-39 (N.D. Cal. 2012); *York v. Starbucks Corp.*, 2011 WL 8199987, at *23-30
27   (C.D. Cal. Nov. 23, 2011).
     [23] *See, e.g.*, Exs. 12; 19; 23; 28.

28

1   skipped a training session about logging overtime attended by other ISCs, whose

2   experiences varied. *See also, e.g., supra* at 6-8.

3       The ADP timekeeping system was later replaced with a new system called

4   Workday. Exs. 129-131. Workday is an ISC swipe-based system, with no auto-

5   population features. Ex. 131 (instructing to "check in" and "check out" for

6   "beginning of the day," "lunch," and "end of the day"). Plaintiff admits that he has

7   no knowledge about Workday, but many other ISCs do and they contend that

8   Workday entries reflect all of their time worked.  *See, e.g.*, Ex. 18 ¶10 ("Now, in

9   Workday, I'm supposed to log my time, including my start time, stop time, and the

10  start and stop times for my lunch. I never feel any pressure from anyone to under-

11  report my time in Workday."). *See also, e.g.*, *supra* at 6-8.

12      In a similar case, this Court recently denied certification based on a nearly-

13  identical theory as Plaintiff's. *Peabody v. Orange Cnty. Transp. Auth.*, Case No.

14  CV 13-1226-JLS (ANx), Dkt. 79, Order at 12 (C.D. Cal. July 7, 2015) (Staton, J.).[24]

15  In *Peabody*, OCTA bus operators were paid for a standard 8-hour shift by default.

16  *Id.* at 7. If a bus operator worked longer than 8-hours, he was required to submit an

17  "Exception Time Sheet" or ETS reflecting additional work. *Id.* This Court held that

18  "when operators do not submit ETS's for this work, it is the result of their own

19  discretion and not as a matter of OCTA policy," meaning that "to the extent that

20  bus operators have failed to submit ETS's for time worked, Peabody has not

21  demonstrated that it is a result of a practice common to the entire class that will

22  'drive the resolution of the litigation.'" *Id.* at 12 (quoting *Dukes*). The same is true

23  here: Zillow trained ISCs to submit adjustments to the ADP system if their actual

24  work hours differed from the default rule, and to accurately swipe time in Workday,

25  and multiple ISCs have confirmed that they knew how to do so. Exs. 127-131;

26  *supra* at 7 & n.9.  That Plaintiff contends his experience differs proves certification

27

28  _____
[24] Orders from PACER are attached to the Bonn Declaration as Exhibits 51-53.

18

4037007v1/014495

1    is inappropriate.

2              b.    *Individualized, Subjective Feelings of Work "Pressure"*

3         Plaintiff also points to limited, anecdotal evidence that (1) one manager,

4    Edward Cornelius, out of at least 17 different managers, may have known that some

5    OTC work by some ISCs was occurring and (2) a handful of ISCs worked OTC and

6    did so because of subjective pressure they felt from productivity metrics, "waves,"

7    or "blitzes." Plaintiff admits that managers have wide discretion to manage their

8    own teams and that their approaches differ considerably, including as to breaks. Ex.

9    37 (Freeman Dep. 99-103). One of Plaintiff's other managers made clear to his

10   team that they were to work an 8-hour day plus a 1-hour unpaid lunch. *Id.* at 99-

11   100; *see also* Ex. 210. Numerous other ISCs never felt pressured to work OTC.

12   *Supra* at 6-8, 15-16. And while Plaintiff claims "blitzes," "waves," call-time and

13   quotas pressured ISCs to work overtime, none of them show that class members

14   were uniformly pressured to work OTC.

15        *First*, as described in Section III.A.1.b above, numerous ISCs indicated that

16   blitzes were scheduled within an 8-hour shift, tended to last an hour, and did not

17   require OTC work. *Second*, "wave" days refer to the "scheduled release of high-

18   demand inventory," which usually "happen[s] early in the morning." Ex. 3 ¶16.

19   While a handful of Plaintiff's declarants claim they were required to come in early

20   and stay late on "wave" days, others claim that "everyone was permitted to leave

21   work at 2 pm and lots of people did that." Ex. 15 ¶10. *Third*, numerous declarations

22   demonstrate that some ISCs felt no pressure to meet call-time metrics, others felt

23   hitting their quotas was easy, while others believe that the pressure of meeting work

24   goals changed day-by-day and manager-by-manager. *Supra* at n.3.

25        At best, Plaintiff has shown that "business pressures exist which *might*" leave

26   some ISCs to work OTC, a theory that would still require "individualized factual

27   determinations" in order to discern "whether class members did in fact engage in

28

                                         19

off-the-clock work and whether [Zillow] had actual or constructive knowledge of off-the-clock work performed." *Koike v. Starbucks Corp.*, 378 F. App'x 659, 661 (9th Cir. 2010). Other courts have similarly declined to grant certification where the alleged common evidence is general work pressure. *Richie v. Blue Shield of Cal.*, 2014 WL 6982943, at *9 (N.D. Cal. Dec. 9, 2014) (OTC certification denied where Plaintiff alleged inability to "meet their production target within their 8 hour shift" and "often worked through lunch or breaks in order to meet their production targets").

This is not a case where there is overwhelming evidence of an "unofficial policy of discouraging reporting of such overtime." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014). To the contrary, numerous ISCs deny feeling any such pressures, knew how to report their overtime through ADP and Workday, and have been paid for overtime they worked. This Court has repeatedly recognized that certification of OTC claims is inappropriate where, as here, Plaintiff offers only his personal, anecdotal experience and "fails to show a common core of facts or a common policy or practice that affected all class members" equally. *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 522-23 (C.D. Cal. 2011) (Staton, J.); *see also Eddings v. Health Net, Inc.*, Case No. CV 10-01744 JLS (RZx), Dkt. 109, Order at 17 (C.D. Cal. Feb. 23, 2011) (Staton, J.) (finding on OTC claims that "Plaintiff has failed to show that Defendants' login policies, rather [than] class members' individual practices, caused the harm alleged.").[25]

## B. Ascertainability, Manageability, and Superiority Are Lacking.

Plaintiff's proposed class and subclass suffer from numerous other defects.

---

[25] Plaintiff's derivative claims for wage-statement violations, waiting-time penalties for former ISCs, and unfair business practices fail to satisfy commonality, typicality, and predominance for the same reasons as the underlying meal break, rest break, and OTC claims. *See ,e.g., Officemax of N. Am.*, 2012 WL 5473764, at *6 n.13 (C.D. Cal. Nov. 5, 2012) (declining to certify waiting-time penalty claims because they are "derivative of the meal and rest break claims, which the Court finds unsuitable for class treatment").

*First*, Plaintiff's class definition of ISCs "who *worked a scheduled shift* beginning approximately between 8:00 a.m. and 4:00 p.m" is not ascertainable. (Mot. at 7 (emphasis added).) This proposed class requires individualized inquiries into what time each ISC started work on a given day because (1) many ISCs had no scheduled shift, (2) scheduled their own shifts to begin at varying times (many before the 8:00 a.m. cut-off described) through individual consultation with their managers, or (3) had the discretion to start their shifts at whatever time they pleased. Exs. 2 ¶4 ("Prior to Workday, there wasn't really any set schedule. You sorta came in when you wanted. You left when you wanted. You took lunch when you wanted."); 20 ¶7 ("When I first started at Zillow, I had no set scheduled shift."); 30 ¶4 ("For a while, I had no scheduled shift at all and I could come in whenever I wanted to, whether it was at 6 am or even as late as 9 am.").[26] There "is clearly no objective way to determine" class membership "absent individualized fact-finding." *Ballard v. Bank of Am.*, 2013 WL 4807193, at *3 (C.D. Cal. Sept. 6, 2013) (Staton, J.).

*Second*, the case is unmanageable. "Due process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972). Zillow "has a right to cross-examine each [putative class member] to determine whether there is liability as to that specific person." *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 253 (C.D. Cal. 2006). "Because the adjudication of claims on a classwide basis would amount to the adjudication of each of the claims on an individual basis, effectively, [] the class action would be unmanageable." *Nguyen v. BDO Seidman LLP*, 2009 WL 7742532, at *8 (C.D. Cal. July 6, 2009).

*Third*, a class action is not the superior method of adjudication because "putative class members have sufficient monetary incentive to pursue their own claims," and indeed, Plaintiff claims his damages are between $140,000 and

---

[26] *See also* Exs. 11 ¶6; 18 ¶12; 22 ¶6; 23 ¶3.

$150,000 just as to him, Ex. 37 (Freeman Dep. at 39), a fact that "weighs heavily against class certification." *Nguyen*, 2009 WL 7742532, at *8. This Court also recently held that where, as here, the claims asserted request an award of attorneys' fees to the prevailing party, *see, e.g.,* Cal. Labor Code § 1194 and Second Amended Complaint (Dkt. 45) ("SAC") at 27-28 (requesting fees), "there appears to be little reason why a class action is more efficient than individual actions." *Lightbourne v. Printroom, Inc. et al.*, 307 F.R.D. 593, 603 (C.D. Cal. 2015) (Staton, J.) (quotation and citation omitted).

**C.    Plaintiff and His Counsel Cannot Adequately Represent a Class.**

1.    As a *Former* ISC, Plaintiff Cannot Represent *Current* ISCs.

The class representative "must show standing with respect to each form of relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970, 978 (9th Cir. 2011). As a former ISC, Plaintiff does "not have standing to seek injunctive relief," and thus he cannot "adequately protect the interests of the class as a whole." *Id.* at 986. *See also* SAC ¶6 (seeking "injunctive relief"). Nor can Plaintiff cure this adequacy problem by seeking to "'certify only a class for monetary damages because the claims of current employees would be impermissibly split.'" *Tigbao v. QBE Fin. Inst. Risk Servs., Inc.*, 2014 WL 5033219, at *2 (C.D. Cal. Sept. 22, 2014) (Staton, J.) (quoting *Beal v. Lifetouch, Inc.*, 2012 WL 3705171, at *4 (C.D. Cal. Aug. 27, 2012) (Staton, J.)).[27]

2.    The Releases Signed by Many Former ISCs—But Not Plaintiff—Preclude Certification of a Former-ISC Subclass.

Nor can Plaintiff adequately represent his proposed subclass of only former ISCs, because a substantial number executed Releases in exchange for additional severance pay. Exs. 32-97. Plaintiff, however, did not. Key features of the Releases

---

[27] *See also Walker v. Life Ins. Co. of the Southwest,* 2012 WL 7170602, at *11 (C.D. Cal. Nov. 9, 2012) (denying certification because "[p]roposed class representatives have a conflict of interest with the absent putative class members if they do not have standing to or refuse to assert certain claims that may be available and advantageous to the absent putative class members.").

include (1) a broad "release" of Zillow from "any and all claims" including those arising under the "California Labor Code" at issue here; and (2) a requirement that, if a former ISC breaches the Release by seeking additional compensation from Zillow, the former employee must return his severance, pay Zillow's reasonable costs and attorneys' fees, and "indemnify" Zillow from "any breach of this Agreement by him." *See, e.g.*, Exs. 36 (Johnson Dep. 36, 43-44); Ex. 61 at ¶¶2(c), 12. Plaintiff's counsel also represent three putative class members—including declarants Johnson and Peterson—in a separate lawsuit against Zillow, in which they contend their Releases are invalid based on the fact-specific, individualized defense of duress.[28] Zillow has counterclaimed for breach of their Releases. Ex. 33.

A "putative representative who has a claim because he or she did not sign a release or waiver that arguably extends to the claim in favor of the defendant is atypical and cannot serve as a representative of class members who have executed releases." 1 McLaughlin on Class Actions § 4:18 (12th ed.). Numerous courts recognize that this defeats typicality and adequacy.[29] The Releases also raise individualized inquiries that require an unmanageable number of mini-trials and defeat predominance, as "the threshold issue of whether those releases should be declared invalid or rescinded would assume major importance"—an issue that "is ill-suited to class treatment, since the state of mind of each individual signer would presumably need to be explored." *Ciarlante v. Brown & Williamson Tobacco Corp.*, 1995 WL 764579, at *2 (E.D. Pa. Dec. 18, 1995).

### 3.   Plaintiff and His Counsel Are Inadequate Due to The Appearance of Divided Loyalties.

Plaintiff and his counsel are also inadequate for several reasons.

---

[28] *See, e.g.*, Exs. 35; 40 (claiming Johnson signed Release "while he was feeling humiliated and depressed"); 41 (claiming Peterson signed release under duress); Ex. 42 (claiming Youseph signed Release under duress).
[29] *See, e.g.*, *Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 551 (5th Cir. 1988) (no standing); *Melong v. Micronesian Claims Comm'n*, 643 F.2d 10, 15 (D.C. Cir. 1980) (no typicality or adequacy); *Carlstrom v. DecisionOne Corp.*, 217 F.R.D. 514, 417 (D. Mont. 2003) (no adequacy).

*First*, Plaintiff's counsel's simultaneous prosecution of the Individual Lawsuits creates a disqualifying appearance of divided loyalties. Plaintiff's counsel represent nine other former Zillow ISCs in other lawsuits still pending against Zillow. Exs. 32-35. At least one such lawsuit raises similar allegations regarding breaks and overtime. Ex. 35 ¶17. The Individual Lawsuits seek *over $150 million in compensatory damages* and unspecified additional punitive damages, Exs. 44-47, which could add another $150 million.[30] Plaintiff was introduced to his counsel by one of the plaintiff's in the Individual Cases, and engaged in a joint, pre-suit mediation with two of the plaintiffs in the Individual Lawsuits. Exs. 37 (Freeman Dep. 19-20); 50 at 22-23.

"Courts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs or class members in the case." 1 McLaughlin on Class Actions § 4:39 (12th ed.). In a similar case, the court in *Lou v. Ma Labs., Inc.*, 2014 WL 68605, at *2 (N.D. Cal. Jan. 8, 2014), held that plaintiff's counsel was inadequate because of the firm's simultaneous representation of a separate action against the same defendant. The court noted that "Defendants have an incentive to settle all claims at once, if it settles at all, thereby creating opportunities for counsel to manipulate the allocation of settlement dollars," and recognized that the putative class "deserves to be championed by its counsel unencumbered by their duties to other clients." *Id.* The court therefore held that "Counsel have a conflict and may not serve." *Id.*

*Second*, Plaintiff admitted in his deposition that he too is considering bringing wrongful-termination claims, but that he has not yet considered whether he would be willing to resolve the putative class claims if it meant releasing his wrongful termination claims. Ex. 37 (Freeman Dep. 18, 21-24, 40-41). Plaintiff's

---

[30] *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (permitting "a ratio of approximately 1:1" of compensatory to punitive damages).

failure to prioritize the putative class claims over his individual claims creates an appearance of divided loyalties, which further renders him inadequate. *See De la Cueva v. Alta-Dena Certified Dairy, LLC*, Case No. CV 12-1804-GHK (CWx), Dkt. 61, Order at 3 (C.D. Cal. May 9, 2013) (plaintiff inadequate due to "potential conflicts" if plaintiff is "likely to prioritize his individual claims over the class claims" and noting divided loyalties potentially at issue for "global settlement of all claims").

*Third*, Plaintiff's counsel has wrongly assured Plaintiff payment of an incentive award. Plaintiff testified that he is "entitled" to "additional money in this case by virtue of being a named plaintiff," there is "a specific number, dollar value, in terms of the compensation that [he] expect[s] to receive," and the "dollar amount that [he] believe[s he] is entitled to as additional compensation for being a class representative" is "based upon communications" he had with his "counsel in this case." Ex. 37 (Freeman Dep. 107-10).  When asked to disclose what the amount is, Plaintiff refused based on his counsel's instruction. *Id.* The Ninth Circuit prohibits such assurance of incentive payments, and Plaintiff and his counsel's failure to disclose the details of this arrangement violates their "fiduciary duties to the class and duty of candor to the Court." *Rodriguez v. W. Publishing Corp.*, 563 F.3d 948, 955, 959 (9th Cir. 2009), *distinguished on other grounds by In Re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015).

## IV.   CONCLUSION

Whether analyzed under the rubric of commonality, predominance, adequacy, typicality, or superiority, the defects in Plaintiff's motion preclude certification under Rule 23. For the above reasons, Zillow respectfully submits that the Court should deny Plaintiff's motion for class certification.

4037007v1/014495

1    Dated:  December 28, 2015            Respectfully submitted,

2

3                                                     BROOKE A. M. TAYLOR
STEVEN G. SKLAVER
AMANDA BONN
DAVIDA BROOK
4                                                     RAVI DOSHI
SUSMAN GODFREY LLP

5

6

7                                         By: */s/ Amanda K. Bonn*
                                                 Amanda K. Bonn

8                                         Attorneys for Defendant Zillow, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4037007v1/014495