# Exhibit 21

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IAN FREEMAN, an individual and as the representative of a class of similarly situated persons, | |
| Plaintiff, | Case No. SACV 14-01843 JLS (DFMx) |
| v. | |
| ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive | |
| Defendants. | |

## DECLARATION OF VY NGUYEN

1

I, Vy Nguyen , state as follows:

1. My name is Vy Nguyen. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would and could testify to all matters set forth herein.

2. I live in Orange County, California. I started working with Zillow in July of 2014 to be an Inside Sales Consultant. My first manager was Cody Fagnant. In August of 2015 I moved to Edward Oh's sales team.

3. As an Inside Sales Consultant my job is more or less to sell advertising to real estate agents. I do cold calling, I manage inbounds, I handle customer service issues, and I manage my book of business.

4. I generally had a schedule that I liked to stick to in order to keep myself organized. In the morning I would usually cold call or follow-up on in-bonds. Later in the day I would follow-up on my tasks which consists of appointments or other reminders I had set for myself the day before. Then I'd usually take a lunch break. In the afternoon I'd tend to circle back with people who I had not been able to connect with in the morning or again go through my tasks.

5. With this kind of job you have to manage your own time. So if I have to take a break, I take it. I've never felt guilty for taking any breaks. My managers have never given me a hard time for taking breaks. I don't have any set schedule for when I take my breaks.

6. I didn't usually check-in with my manager prior to taking a rest break or a lunch break. Pre Workday, I don't have any record of when I took my lunch breaks.

7. I take a 30-45 minute lunch that I typically start anywhere between 11:00 a.m. and 12:00 p.m. Sometimes I'll eat the catered lunch. Sometimes I'll go to the cafeteria downstairs. Sometimes I'll drive to a nearby restaurant. It usually depends on whether or not the catered food looks good on any given day. The fact

**CONFIDENTIAL**                                                              **Zillow-IF 000152**

that they bring in catered food does not make me feel pressured to stay at work during lunch. I've never felt like it was looked down upon to take a lunch break.

8.     When you are in a sales environment its obviously competitive, but I'll go eat when I need to eat. I don't ever feel like I wasn't free to handle my own business.

9.     When I first started with Zillow, more or less during my first month, I worked some overtime because I was getting used to the new job. I didn't feel like I was forced to work overtime and my manager would even ask me why I was still here. Pretty much since then I've worked an 8 hour a day. I don't really work overtime at all. Maybe a 10 to 20 minutes here or there but nothing that I feel is notable.

10.     I didn't find it at all challenging to hit the 210 activity requirement during the 8 hour work day. I think it's a reasonable requirement. And in my experience the more people you talk to, and the more time you spend on the phone, obviously the more opportunities you have to make a sale.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⎭ day of September, 2015 at Irvine, California.



_____
Signature

**CONFIDENTIAL**                                   **Zillow-IF 000153**

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P.  We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.*  We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit.  Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company.  We do <u>not</u> currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit.  That decision is solely yours to make.

- You have the right to decide not to speak with us.  There will be no adverse consequences if you choose not to speak with us.  Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided.  We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to.  There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.


Dated: _____9/17/15_____          _____
                                    (Signature)

CONFIDENTIAL                                    Zillow-IF 000155

# Exhibit 22

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION**

4

5    IAN FREEMAN, an individual and as the representative of a class of similarly situated persons,

6

7              Plaintiff,                          Case No. SACV 14-01843 JLS (DFMx)

    v.

8    ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive

9

10             Defendants.

11             **DECLARATION OF KRISTA NORWOOD**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

I, Krista Norwood, state as follows:

1. My name is Krista Norwood. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2. I started working at Zillow in insides sales in August 2013 where I remained until I went on maternity leave in September 2014. I returned from my leave in March 2015, and when I returned to Zillow, I moved into account management.

3. My first manager in inside sales was Jami Thomas, and then my manager was Brandon Hobbs, and then I was with Gabe Schmidt, who was my last manager before I left on leave.

4. All my managers were great. Jami is awesome – she is very positive and I never felt harassed or bullied by any of my managers. I felt that I was in charge of me, and my managers were there for support. If I wanted to take an hour lunch, these managers would say go for it, and I had goals and I was in charge of making those goals.

5. Brandon also was very positive, and felt that if I needed anything he was very supportive and always felt he encouraged me in a positive way and I never felt threatened, and if I ever did feel that way, I wouldn't stay here so long. I feel like Zillow is family and my managers were so supportive. Jon Boller was great as well. I had a rough year before I went on maternity leave – I lost my grandmother and my dad and was stressed about making quota and management was very supportive to let me take my time and do what I needed to do and everyone was supportive. Gabe Schmidt was my last manager in inside sales and he too was so positive and would motivate me. I was pregnant when Gabe was my manager, and Gabe's wife was pregnant too at that time, and I felt he was extra supportive at that time for me and completely understood how to help me – if I felt bad that day, in the wrong mindset, Gabe would talk to me and ask how he could motivate me that

2

1  day, whether it was to give me good zip codes or to buy me lunch if I closed a

2  specific deal or let me good home if I wanted to.   He told me not to stress about

3  hitting quota and just to do the best that I could do that day and he would want to

4  motivate me to be part of the team and help change my day around to make sales.  I

5  never felt threatened, upset, or angry with any of my managers.

6          6.    I did not work a set schedule in inside sales.   You get out what you

7  put in, so I would work hard to hit my goal and really would not look at the clock to

8  be honest.

9          7.    I always felt that I was able to take as many breaks as I wanted, when I

10 wanted.  I never felt that I only had 2 15 minute rest breaks – I had multiple breaks

11 that I could take any time to walk around the building or check my cell phone.  My

12 managers basically were there for my support, and I controlled my day and my

13 breaks.

14         8.    I would normally break for lunch for an hour, and try to go around

15 Noon or 1 pm if I came in around 8 a.m.  I often would go off site to eat lunch at

16 Subway or grab pho (which is off the 405 on Culver) or Wahoo's.  There's also a

17 café in the building with tables outside and I would order food from the café and

18 hang out with friends and have lunch there.   Sometimes I ate lunch at my desk and

19 if I did so it was my choice but most of the time anyway I would leave the building.

20 When and where I took my lunch depended on the day.  Some of my teammates in

21 inside sales that often joined me for lunch offsite included Hannah, Lacy, Samy

22 Tyby (because we started in the same class together). I also sometimes ate the

23 catered lunch in the kitchen but even when the catered lunch was here, I could still

24 leave the building but why would I?  We were spoiled – the food was good and free

25 and everyone is mingling and chatting and it's nice to re-group at the end of the

26 week with your friends and see how everyone is doing and we did that over that

27 catered lunch weekly.

28

3

9.     When I was in inside sales, I prospected clients by searching for brokerage houses, and if they had a phone number, I would call them.  I didn't care if the potential customer was a top-producer or successful – I just called them to have them hear about Zillow.  I did not have a particular pitch.  I would switch it up all the time and did not work off of a script.  I noticed that when I would try other people's sales styles, that it didn't work for me – my style is smooth-sailing, conversational and was not pushy. Everyone has different prospecting and selling styles in inside sales, and everyone has their own style of approaching sales and that is why we are successful – there is no specific way of doing sales and calling people.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2015 at Irvine, California.

_____

Krista Norwood

4

CONFIDENTIAL

Zillow-IF 000159

**Disclosure Statement**

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 9/17/15

_____
(Signature)

Krista Norwood

CONFIDENTIAL                                        Zillow-IF 000161

# Exhibit 23

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| IAN FREEMAN, an individual and as the representative of a class of similarly situated persons,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive<br><br>　　　　　Defendants. | Case No. SACV 14-01843 JLS (DFMx) |

**DECLARATION OF EDWARD OH**

3857910v1/014495

1

CONFIDENTIAL　　　　　Zillow-IF 000225

I, Edward Oh, state as follows:

1.     My name is Edward Oh, but I go by Ed.  I am over the age of 18.  The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I could and would testify to all matters set forth herein.

2.     I work in Zillow's Irvine, California office the West Region Sales Manager.  I have had that title since September 1, 2015 when we had a re-organization. Before that, I was an Inside Sales Manager from about November 2013 until the end of August 2015. Before I was promoted to Inside Sales Manager, I worked as an Inside Sales Consultant ("ISC") in Irvine starting in July 2012 through November 2013. When I was an ISC, my manager was Andreas Madsen the entire time.

3.     As an ISC, I often would come in at around 7:00 a.m. I liked to come early because I had a commute in the morning. And I would often leave at around 5:00 p.m. But it probably varied day-by-day. Sometimes I got in more like 7:30 a.m. Some days I left at 4:30 p.m. There really wasn't a set schedule and my schedule changed a little each day. I liked to take a 20-minute break when I would get off of a long phone call. I tended to take probably four or so 20-minute breaks throughout the day. I also generally took a full 1-hour lunch break. Sometimes I would drive somewhere for lunch. Other times I would hang out in the kitchen in the office. It just depended on how I felt that day. I had a group of friends who were also ISCs and we usually had lunch together. In terms of what time I took my lunch, every day was different. Sometimes I would take it earlier, say 11:00 a.m., if I was feeling hungry. Other times, maybe I would take it later, say at 12:00 p.m., especially if I was waiting for my friends to all be ready for lunch. It just changed day by day.

4.     Because I would take extra rest breaks, even though technically my start time and end time for the day may make it seem like I was here for 10 hours or

2

3857910v1/014495

so, once you subtract out my 1-hour lunch and my extra breaks, I felt like it usually averaged out to about 8-hours of work, maybe 5 or 10 minutes more than that. I don't think my manager knew or could tell if I worked an extra 5 or 10 minutes.  He usually came in at 8:00 a.m., so he really had no way of knowing how long I had been in there before he arrived. During the day, I had a lot of discretion to take breaks whenever I wanted to and I did. Like I said, I would take four or so 20-minute breaks throughout the day. Every ISC on the team had discretion to manage their own days like I did, so people were constantly in and out.

5.      I never felt pressured by anyone at Zillow to skip my lunch or cut it short or take it at any particular time. I also never was discouraged from taking rest breaks, even though I took a lot of extra breaks during the day. I liked that I had the freedom to take my breaks whenever I wanted to as long as I got my job done. I didn't think there was any particular policy about rest breaks—I knew there were some sort of labor law posters in the kitchen, but I didn't really read them. I just got the sense from my manager that I was allowed to take rest breaks at my discretion during the day for as long as I needed to clear my mind. And that's what I did.

6.      When I was an ISC, there was a 210 minute call time metric. I was always in the upper echelon of ISCs for activity metrics, so I never really found it difficult to hit that call time metric when working 8 hours in a day. I never felt like I had to skip breaks or lunch in order to hit that metric. I've been in sales for a long time, so the call time metric has never been an issue for me. When someone is new to sales, it's sometimes tougher for them to hit that metric because they haven't really learned yet the way to go about things efficiently. But that really varies person-by-person.

7.      When I was first promoted into management, I started managing a team of about 10 ISCs. As a manager, I started coming in later in the day, more like 8:00 a.m. because I got married and moved a lot closer to the office which helped my commute. I would still leave at around 5:00 to 5:30 p.m. As a manager, I tended

3

**CONFIDENTIAL**                                              **Zillow-IF 000227**

not to micromanage my team's breaks and lunches or their schedules. I just told them they were allowed to take up to an hour-long lunch whenever they wanted to during their day and they had freedom to take whatever rest breaks they needed. I think it's important for people to take breaks to mentally reset. But I never told people that they were required to take any particular break at any particular time, nor did I tell them they were not allowed to take any break. It was really up to them how to manage their day and people on my team were in and out throughout the day. For example, I had one person on my team who was a smoker and he took about 8 breaks throughout the day to smoke. I never timed him, or told him he couldn't do that—in my view, if that's what he needed to do in order to perform at his best, that was fine.

8.      There's something at Zillow called a Blitz. On my team when I was a manager, I tended to do two Blitzes in the day. I would have one at 8:30 a.m. to 9:30 a.m. and another one from 1-2 p.m. Each Blitz we had a specific agenda in mind. For example, in the morning Blitz we might focus on calling realtors in Florida. And then in the afternoon Blitz, we might focus on calling realtors in California. It just changed every Blitz and every day. I viewed a Blitz as having a 1-hour period where there's a mission and everyone on the team is doing the same thing. I didn't really require people to stand up during the Blitz. I let my team do what they wanted to do. Some people would stand up, but others would sit down and that's okay. I personally prefer to sit down during a Blitz so I don't think it's fair for me to ask anyone else to, especially since I know I can be productive sitting down. If someone needed to go the bathroom during a Blitz, of course they could do that. As far as rest breaks and lunch breaks go, I made sure my team knew when the Blitzes were happening so they could plan their rest and lunch breaks around it.

9.      I believe in early 2014, the company rolled out an ADP timekeeping system. I believe there were emails that were circulated telling ISCs how to adjust their time entries in ADP. I also think there were some in-person trainings where

3857910v1/014495

4

HR instructed ISCs verbally how to use the ADP system and how to change their time entries if their actual working hours changed from the default. At that time, I generally worked from 8:00 a.m. to 5:00 p.m. and I didn't believe that people on my team were working longer hours than that. I think people on my team were pretty good about taking an hour lunch and taking their rest breaks, but I'm sure some people divided up their break time as they saw fit throughout the day. I never heard that anyone on my team had worked overtime or had changed their time entries in ADP to reflect overtime.

10.    In early 2015, another system called Workday was rolled out for timekeeping. Again, HR did some trainings with ISCs to teach them how to use the new system. ISCs are now required to log their start and end time and also the start and end time for their lunches. In the beginning of that roll-out, I told ISCs on my team they needed to take a 1-hour lunch break. But some ISCs said they would rather take a 30-minute lunch and leave earlier.

11.    Now I have to go into Workday as a manager and approve each ISCs time to make sure they are entering it accurately. Some ISCs on my team work a few minutes of overtime here and there—maybe 15 or 20 minutes on a given day. I would say in a 40-hour week, the hours for ISCs on my team tend to vary between 38 and 42 hours. If people work in the 42-hour range, for example, they are paid overtime.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13ᵗʰ day of October, 2015 at Irvine, California.

_Edward Oh_

Edward Oh

3857910v1/014495

5

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 10 / 13 / 15                              _Edward Or_
                                                  (Signature)

880731v1/010993
2527077v1/013096

2

# Exhibit 24



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

IAN FREEMAN, an individual and as the representative of a class of similarly situated persons,

        Plaintiff,

v.

ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive

        Defendants.

Case No. SACV 14-01843 JLS (DFMx)

## DECLARATION OF SHELLY PALER

1

Zillow-IF 000162

I, Shelly Paler, state as follows:

1.      My name is Shelly Paler.  I am over the age of 18.  The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would and could testify to all matters set forth herein.

2.      I live in Long Beach, California.  I started working with Zillow on September 15, 2013.  I just celebrated my two year anniversary with the company. I started out as an Inside Sales Consultant and recently became a team leader.

3.      I was originally managed by Andreas Madsen, followed by Cody Fagnant, followed by Jami Thomas, followed by Kelsey Didier, and now Samy Tyby.

4.      Each manager is so different.  Some are very quiet and methodical. Others are really hyper and exciting.  I think they each bring a different asset to the floor.  For example, I'm a fairly quiet and reserved person so it was really helpful for me to be on Jami's team because she is more outgoing and brought that out of me.  I think it's great that we have such a well-rounded group of managers and it has definitely helped me to get to the point where I am at now.

5.      The different managers also have different games or other motivational tactics to get us going.

6.      Things change every day on this job.  We are constantly presented with different opportunities to get in front of different agents and brokers.  It makes it fun because it's not a drone job.  It's an exciting job.  We also help our agents learn how to brand themselves and also prospect for sell by owners.

7.      I have no complaints.  I've been here for two years.  I've always hit quota.  I've never had any issues.  I think it all boils down to the fact that some people want to work and some people only want to play.  Zillow provides a very fun environment and some people take advantage of that and don't end up working. In my opinion, some people took advantage of a good situation.

2

**CONFIDENTIAL**                                                      **Zillow-IF 000163**

8.    My managers will frequently encourage me to leave my chair and go take breaks.  They'll tell me to "go walk around."  If I've had a frustrating call my manager will encourage me to go blow off some steam.

9.    They provide us with so many outlets for breaks.  There's a fully stocked kitchen, there's a game room with ping pong, there's really anything you could want.

10.    They also bring in lunch.  It's one of the many incentives they provide. Some people get something and want more but I've always felt very taken of.  I think it's great that they bring in lunch.  It means I save on gas money.  It means I don't have to spend money on lunch.  It means I don't have to lose my parking spot in the always very full garage.  For me, the catered lunches are all upside.

11.    You always have an outlet here.  You're not stapled to your seat.  If you are, that's your choice.

12.    Ian Freeman once called one of my agents, which you're not supposed to do.  He also told my agent that I wasn't doing a good job.  We're not supposed to call each other's' agents, let alone speak poorly of other representatives when we do that.  It reflects poorly on Zillow as well.

13.    My lunch plans very day to day.  Sometimes I walk to the nearby Subway or to Specialties.  Sometimes I bring my lunch and will chit chat with a friend.  If we're on the floor, my manager will often encourage us to take it off the floor and go sit in the kitchen or outside.

14.    We are usually blitzing for about two hours a day.  Until very recently I have never stood while on the phone—whether blitzing or otherwise.  Nobody ever came up to me and told me I needed to stand.  Since I've started standing, more recently, I've seen that standing can give you more energy, but they certainly don't require that you do it.

3

**CONFIDENTIAL**                                                                    **Zillow-IF 000164**

15.    If you're on the phone and you're dialing, and you're not walking around and chit chatting the whole day, it's easy to be successful within an 8 hour day.

16.    There's so much opportunity here, if you try, you'll be successful. You do, however, need to be organized throughout the day and make sure that when you are not on a break or a lunch period you are actually working.

17.    It's my personality to work hard and I've frequently had managers come up to me and encourage me to take a break or go home for the day.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of September, 2015 at Irvine, California.

_____
Signature

## Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

•   Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

•   Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

•   Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

•   It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

•   You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

•   If you decide to speak with us, you may change your mind at any time and stop our conversation.

•   At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

•   You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE.  If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign.  We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 9/17/15

(Signature)

CONFIDENTIAL                                    Zillow-IF 000167

# Exhibit 25

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3                **SOUTHERN DIVISION**

4

| | |
|---|---|
| IAN FREEMAN, an individual and as the representative of a class of similarly situated persons, | |
| Plaintiff, | Case No. SACV 14-01843 JLS (DFMx) |
| v. | |
| ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive | |
| Defendants. | |

**DECLARATION OF DANIEL REINHARDT**

1

I, Daniel Reinhardt, state as follows:

1. My name is Daniel Reinhardt. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2. I started at Zillow in inside sales in July 2014. In training, my manager was Britany Fisher and after those 2 weeks my manager was Karen Han, who remains my manager today. Currently, I am a business consultant covering the south region, and I assumed that position last month, August 2015.

3. I have always been able to take my lunch and rest breaks. Where I go to lunch and when depends on how hungry I am at the time. Sometimes I skip lunch when I'm not hungry, but that's my choice. I have never been directly told that I have to skip lunch. There's a big lunch room and we sit there when there's a catered lunch and I don't think it's required to work at my desk for eating the catered lunch.

4. I am a smoker and go downstairs to smoke cigarettes. I usually go 10 minutes in the morning and 10 minutes in the afternoon for my smoke breaks outside and I am not working during those breaks. There are generally other members of inside sales down there smoking during the smoke breaks, and I usually go on my smoke break with someone else in inside sales.

5. Karen Han has not bullied, harassed, or intimated me. She has brought to my attention days that I did not make 210 call time and if you did not make 210 call time sometimes you might not be entered in sales contests, among other things, or might get verbal warnings or written up eventually but whether you can make 210 call time is luck of the draw on some days. You are picking up the phone and sometimes you get 50 voicemails in a row or sometimes you get a chatty agent that will speak with you for an hour. Other days you can dial 200 times and strike out and not reach your call time.

CONFIDENTIAL                                                    Zillow-IF 000169

6.     If you have a current book of business, that makes hitting call time easier – the agents already do business with you after all and there is some conversation there and you have a relationship with them.   Cold-calling versus already having an established relationship with an agent makes a world of difference in the length of the call.

7.     As of early 2015, there no longer is a 210 call requirement.   There are days that you are pacing and ahead of the game in terms of 210 call time – if you get an agent on the cold-call who is actually interested in the zip-code, they can keep you on the phone for 30-40 minutes before they sign up.  Other days, an agent will simply ask "how much is it?" and when they hear the answer, they will just hang up, so that's a quick call.  So some days agents are more engaged in buying the product, and some days they are not (or are hard to get a hold of) and all of that impacts the ease of hitting 210 call time in a normal work day.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2015 at Irvine, California.

_____

Daniel Reinhardt

3

CONFIDENTIAL                                   Zillow-IF 000170

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    SOUTHERN DIVISION

4

5    IAN FREEMAN, an individual and as
     the representative of a class of similarly
6    situated persons,

7            Plaintiff,                          Case No. SACV 14-01843 JLS (DFMx)

     v.
8
     ZILLOW, INC., a Washington
9    corporation; and DOES 1 through 50,
     inclusive
10
             Defendants.

11   **DECLARATION OF DANIEL REINHARDT**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CONFIDENTIAL**                                        **Zillow-IF 000171**

I, Daniel Reinhardt, state as follows:

1. My name is Daniel Reinhardt. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2. I started at Zillow in inside sales in July 2014. In training, my manager was Britany Fisher and after those 2 weeks my manager was Karen Han, who remains my manager today. Currently, I am a business consultant covering the south region, and I assumed that position last month, August 2015.

3. I have always been able to take my lunch and rest breaks. Where I go to lunch and when depends on how hungry I am at the time. Sometimes I skip lunch when I'm not hungry, but that's my choice. I have never been directly told that I have to skip lunch. There's a big lunch room and we sit there when there's a catered lunch and I don't think it's required to work at my desk for eating the catered lunch.

4. I am a smoker and go downstairs to smoke cigarettes. I usually go 10 minutes in the morning and 10 minutes in the afternoon for my smoke breaks outside and I am not working during those breaks. There are generally other members of inside sales down there smoking during the smoke breaks, and I usually go on my smoke break with someone else in inside sales.

5. Karen Han has not bullied, harassed, or intimated me. She has brought to my attention days that I did not make 210 call time and if you did not make 210 call time sometimes you might not be entered in sales contests, among other things, or might get verbal warnings or written up eventually but whether you can make 210 call time is luck of the draw on some days. You are picking up the phone and sometimes you get 50 voicemails in a row or sometimes you get a chatty agent that will speak with you for an hour. Other days you can dial 200 times and strike out and not reach your call time. There was no direct pressure to not take breaks but the emphasis on making call time and recourse for not making call time on some

2

1   days depending on whether I was pacing to make call time resulted in me staying
2   late or working longer hours.

3        6.      If you have a current book of business, that makes hitting call time
4   easier – the agents already do business with you after all and there is some
5   conversation there and you have a relationship with them.   Cold-calling versus
6   already having an established relationship with an agent makes a world of
7   difference in the length of the call.

8        7.      As of early 2015, there no longer is a 210 call requirement.   There are
9   days that you are pacing and ahead of the game in terms of 210 call time – if you
10  get an agent on the cold-call who is actually interested in the zip-code, they can
11  keep you on the phone for 30-40 minutes before they sign up.   Other days, an agent
12  will simply ask "how much is it?" and when they hear the answer, they will just
13  hang up, so that's a quick call.   So some days agents are more engaged in buying
14  the product, and some days they are not (or are hard to get a hold of) and all of that
15  impacts the ease of hitting 210 call time in a normal work day.

16

17       I declare under penalty of perjury that the foregoing is true and correct.

18

19       Executed this 17th day of September, 2015 at Irvine, California.

20

21

22                                      Daniel Reinhardt

23

24

25

26

27

28

3

**CONFIDENTIAL**                                                   **Zillow-IF 000173**

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 9/18/2015

_____
(Signature)

DANIEL RONHORSE

**CONFIDENTIAL**                                    **Zillow-IF 000175**

# Exhibit 26

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION**

4

5    IAN FREEMAN, an individual and as the representative of a class of similarly situated persons,

6

7                     Plaintiff,                     Case No. SACV 14-01843 JLS (DFMx)

     v.

8    ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive

9

10                   Defendants.

11                  **DECLARATION OF SHERRY SHOKOOHI**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CONFIDENTIAL**                                          **Zillow-IF 000176**

I, Sherry Shokoohi, state as follows:

1.     My name is Sherry Shokoohi. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2.     I started at Zillow in March 2013 in inside sales. When I started, we had onsite training from managers from Seattle, and my first manager was Andreas Madsen, who moved back to Seattle sometime in late 2013. When he left, my next manager was Brandon Hobbs, which lasted about 3-6 months. I was then transferred to Samy Tyby, that lasted about 1 year. And now I am on Karen Han's team.

3.     I am currently on the business consultant team for the south region, covering Texas, Louisiana, Arkansas, Mississippi, and Oklahoma. My current role is no cold calling, and instead I call current clients. I help coach my clients and customers to get more reviews on Zillow, or to try to buy more shares to show up more often, and other tips on what it takes to be successful on Zillow.

4.     When I was cold-calling, my strategy was to go after agents that were closing deals. My strategy was to call the expensive markets (like Miami, Manhattan, and Dallas), and go after the big agents. I would look up the brokerage and see who were the top dogs and connect with them. Zillow gives us the MSA, that helps show us the agents working or advertising or listing in a particular zip code. I would then use my creativity to figure out whom to call. Everyone here has their own way of doing things – some people stick with Salesforce here; other inside sales folks go to competitor websites; I used this approach.

5.     When I call agents, I do not work off of a script and never have. You gauge what to say to the agent based on, for example, the inventory available in a zip code or whatever my own style suggests would be most effective.

6.     Normally, I eat lunch at my desk but never because I was forced to. It was my choice. I would bring lunch from home or grab a snack from the kitchen. I

2

1    never felt that I could not leave the office if I wanted to, and even on days that I eat
2    at my desk I would still leave the office and go and do what I want to do.  Most
3    people that I've seen take the catered lunch and go outside to the picnic tables to
4    eat.

5          7.    I see teammates in inside sales go downstairs every hour to smoke
6    cigarettes.

7          8.    I never, ever stayed here for a 10 hour day.  I have a very young son at
8    home (he's now 3.5 years old) and never stayed longer here than a full day shift.  I
9    was never reprimanded or threatened or otherwise punished for leaving work after 8
10   hours by any of my managers.

11         9.    I used ADP to keep track of paychecks and pay.  I would log-in on
12   payday, to see what the direct deposit was.  On Workday, I log in daily when I
13   arrive, take a lunch and return from lunch, and when I leave.  I still eat at my desk
14   to this day, but we don't have to, and my managers make it very clear to take my
15   breaks.

16         10.    There were never days here that I felt that I could not take a break.   I
17   never had the feeling that if I went to go lunch outside the office that I would get
18   fired.

19         11.    In a typical day, I can take a rest break anytime I want to.  I will walk
20   to the kitchen, grab a water, check my cell phone, check my social media (like
21   Facebook), call my mother, or go get a coffee and do that once or twice a day for at
22   least 10 minutes.   No one waits at your desk when you return from a break asking
23   "where have you been?"  I am allowed to break when I want to and do that.  And I
24   have not been subject to any bullying here for taking a lunch or rest break.

25         12.    The 210 minutes talk time requirement was stressful and I could get it
26   done in 8 hours.  Daily, it is not unrealistic in my experience when you are calling
27   all day to talk for 210 minutes in an 8 hour day.

28

3

**CONFIDENTIAL**                                                          **Zillow-IF 000178**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2015 at Irvine, California.

_____

Sherry Shokoohi

4

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE.  If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign.  We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated:  9/17/2015

_____
(Signature)

Sherry Shokoohi

CONFIDENTIAL                                                      Zillow-IF 000181

# Exhibit 27



1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   SOUTHERN DIVISION

4

5   IAN FREEMAN, an individual and as
    the representative of a class of similarly
6   situated persons,

7           Plaintiff,                       Case No. SACV 14-01843 JLS (DFMx)

    v.

8   ZILLOW, INC., a Washington
    corporation; and DOES 1 through 50,
9   inclusive

10          Defendants.

11          DECLARATION OF TREVOR STONE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

CONFIDENTIAL                                    Zillow-IF 000182

I, Trevor Stone, state as follows:

1.      My name is Trevor Stone.  I am over the age of 18.  The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2.      I started in inside sales on October 14, 2014, and I came here from Celtic Commercial Finance.

3.      Karen Han is my direct manager. We have a good working relationship.  Karen has not bullied, harassed, or intimidated me.  She treats me respectfully and I have no complaints.

4.      I did not have a scheduled shift in 2014 and now I do.  I am currently a business consultant generally starting at 7 a.m. and leave by 3:30 pm or 4 p.m. (depending on the length of lunch) covering the south region.  Before my current position, my job at Zillow consisted of cold-calling clients or potential clients in the morning, handling inbounds, and then current clients, everything from technical stuff to credit card declines and everything else.

5.      Monday and Wednesday I normally go the café downstairs for lunch, and Friday there is a catered lunch here that I go to in the office.  Sometimes I go across the street to Wahoos, Which Which, or Tortillaz. I mainly go Tuesday and Thursday to the food trucks that are downstairs.   There are 3-4 food trucks downstairs, and usually they are the same group of 8 and they switch which days that they come here.  There is an email that goes out from HR that lets you know which food truck will be here that week but I don't really read that because generally they have Mexican food down there and that's what I want.  For the food trucks, you can't predict how long I go for lunch.  When I started at Zillow, maybe I'd go at 11:30 am to the food trucks and take a half-hour lunch so that I can leave work earlier (30 minutes earlier).  There were a few Fridays that I have a flight to catch visiting my family in Phoenix, so I would leave work earlier to catch that flight.   I was always permitted to do that and was never sat down or criticized for

2

1   doing that.  When and where and how I long I take my lunch break varies day to

2   day.  Sometimes we (me and other guys from inside sales) get our food and go to

3   the game room – where a TV, ping pong table, and shuffle board are and will eat

4   there.  Sometimes it takes 10-15 minutes to get your food, and sometimes shorter –

5   but whatever it is, we then fill the remaining time in the game room eating and it

6   lasts in total between 30 minutes and an hour.  Sometimes I eat outside at the picnic

7   tables.

8       6.   I have never been told to take my lunch break at my desk, and in fact I

9   don't think that I have ever eaten lunch at my desk.

10       7.   I have never been pressured or told to skip my lunch break.   In fact I

11   don't think that I have ever missed a break – I get way too hungry to do that.

12       8.   A lot of people in inside sales smoke here and I see them leave the

13   sales floor and go to take smoke breaks.

14       9.   I don't necessarily take big, long rest breaks other than to go to the

15   bathroom, and that is my choice and am not pressured otherwise.

16       10.   There was training on Workday about taking breaks, and before then

17   for me there was a lot of freedom about when and where to take a break.  I am

18   smart enough to realize that sales generates revenue which earns commissions, and

19   sometimes I choose to skip a break to get more sales, and that is totally my choice –

20   no manager or anyone else has told me to do that.  That's not on Zillow; that's on

21   me.

22       11.   I knew about ADP but I never really checked it or used it.

23       12.   When I cold-called, there were no scripts.  Everyone has their own

24   style.  I would use a friendlier tone, rather than energetic.  I am not in your face.

25   There is no one way to sell. My selling style is logical – emphasizing improving

26   ROI, for example.  I used online resources to find potential customers, and I knew

27   that the customer or potential customer valued online resources and I wanted to

28   help them take advantage of it.   I also wanted to make sure that I was not calling

3

people too much, or if they were not already a premier agent and hadn't been called in a long time, then I would give them a call.   I never used realtor.com to source clients but some people did.

13.    I have never worked longer than 8 hours in a day and was never pressured to do that or punished for leaving work after 8 hours.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 17th day of September, 2015 at Irvine, California.

Trevor Stone

4

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do not currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 09-17-15

(Signature)

CONFIDENTIAL                    Zillow-IF 000187

# Exhibit 28



1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              SOUTHERN DIVISION

4

5    IAN FREEMAN, an individual and as
     the representative of a class of similarly
6    situated persons,

7              Plaintiff,                    Case No. SACV 14-01843 JLS (DFMx)

     v.

8    ZILLOW, INC., a Washington
     corporation; and DOES 1 through 50,
9    inclusive

10             Defendants.

11            DECLARATION OF JAMI THOMAS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3857910v1/014495

1

I, Jami Thomas, state as follows:

1.      My name is Jami Thomas.  I am over the age of 18.  The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2.      I am currently a General Manager in Zillow's Irvine, California office. I oversee three sales teams and managers and am responsible generally for sales in the South Region. There is another General Manager who is responsible for the West Region. I have had this title since approximately September 1, 2015. Before that, my title was Senior Sales Manager. I had that role for approximately one year. Prior to that, my title was Sales Manager. As a Sales Manager, I oversaw a team of Inside Sales Consultants ("ISCs") responsible for selling Zillow's Premier Agent products. As a Senior Sales Manager, I oversaw multiple teams of ISCs and their Sales Managers.

3.      I began working at Zillow in November 2011 in its Seattle office as an ISC. At that time, I reported to Chris Lowe. Around September 1, 2012, I relocated to Zillow's Irvine office and worked out of that office as an ISC for close to three months before I was promoted to Sales Manager.

4.      When I worked as an ISC in the Irvine office, I continued to report to Chris Lowe, who was located in Seattle. I sat on a team of ISCs who reported to Cody Fagnant in the Irvine office, but I did not report to him.

5.      When I worked as an ISC in Irvine, I often came in at around 6:30 a.m. and left by around 3:30 p.m. I had the discretion to come in early and leave early and preferred to do that. I almost always took a lunch—I need to do that in order to get away from my desk, mentally reset, and come back refreshed to make more sales. I would generally take an hour lunch break. I would always leave to grab lunch—I would sometimes walk to Subway, which is about 2 blocks away. Coming from Seattle, I liked to be outside in the sun in California. I would also use my

2

3857910v1/014495

1  lunch break to catch up with family and my boyfriend at the time, so I didn't want

2  to be stuck in the office during my lunch break.

3      6.    I never felt pressured by my manager to skip lunch. I doubt my

4  manager even knew when I was taking my lunch or how long it was because he

5  wasn't even in the Irvine office—he was located in Seattle. Nobody else in the

6  Irvine office ever made me feel discouraged from taking my lunch. I was treated as

7  an adult, and as long as I did my job effectively, I had the freedom to manage my

8  day and make my own schedule.

9      7.    When I first moved to California, I also smoked cigarettes. I would

10  take rest breaks throughout the day to take a smoke break. I would usually take two

11  breaks—one in the morning and one in the afternoon. I've since stopped smoking,

12  but I was a smoker the whole time I was an ISC. I never felt discouraged from

13  taking rest breaks by my manager or anyone else.

14      8.    When I was an ISC, I didn't believe there was any "policy" regarding

15  lunch breaks or meal breaks other than those labor law posters that have always

16  been posted in the kitchen. I felt like I was free to take  a full lunch whenever I

17  wanted to and to take as many rest breaks as I needed. I know there were plenty of

18  smokers who would take what seemed like 10-20 rest breaks a day, and nobody

19  ever said anything to them about that.

20      9.    My decision when to take my rest breaks and my lunch break totally

21  depended on my personal preferences and how my day was going. If I got hungry, I

22  would take my lunch earlier. If I was busy with a call, I would decide to wait until

23  the call was over to take a later lunch. That's not because I was pressured to do that,

24  it's just what I wanted to do. I felt like I was treated like an entrepreneur and given

25  the discretion to manage my business, my schedule, and my breaks.

26      10.   When I was an ISC, I believe there was a call-time metric that you

27  were supposed to hit 180 minutes of call time per day. My average was usually 220

28  to 250 minutes on average, so I never had an issue meeting call time. The way I saw

3

**CONFIDENTIAL**                                          **Zillow-IF 000234**

it, my main job was to be on the phone talking to people, and so a requirement that I spend 3 hours of an 8-hour day on the phone didn't seem like a hard metric to hit. I never felt like the 180 minute call time metric prevented me or discouraged me from taking breaks or lunch.

11.     During my first year at Zillow, I believe I made over $150,000 based largely on my success as a salesperson and the commissions I received. When I was an ISC in California, I don't think I ever really worked longer than 8 hours, factoring in my lunch break. I didn't need to do that in order to be successful at making sales, hit my numbers, and generate high commissions. I never felt like the demands of the job required overtime work in order to be successful.

12.     When I was a manager, I tended to come in at around 6 or 6:30 a.m. and leave around 5 or 5:30 p.m. ISCs on my team came and left during varying times throughout the day—there was no particular set schedule. We aimed for people to come in by 8:00 a.m. I had one ISC from northern Los Angeles who had a tough commute. He used to come in even before I did and then he would leave the office in the early afternoon. Other ISCs would come in later, 8:15 or 8:30 a.m. or even later, and then they may have left later. My management style when it came to rest breaks and lunch breaks was to treat everyone on my team like entrepreneurs and give them freedom to manage their schedule. Some ISCs on my team were smokers and would take multiple rest breaks throughout the day. Other ISCs would also take multiple rest breaks, whether they were coffee breaks, errand breaks, breaks to go clear their mind, whatever they needed. I never really monitored how many rest breaks anyone was taking or how long they were—the only thing I looked at was their performance metrics.

13.     ISCs on my team would also have varying practices regarding their meal breaks. Once again, I gave them discretion to take their meal breaks whenever they wanted to. If someone was hungry early in the day, he or she could go for a lunch break. Or if he would prefer to wait until later, that was his choice. There

3857910v1/014495

CONFIDENTIAL                                                    Zillow-IF 000235

1   were some groups of ISCs on my team who were friends and would go together for

2   lunch. Other ISCs would take lunches longer than an hour. Still others would go

3   home to see their kids during lunch. And others would sit at their desk and do

4   personal tasks, like paying bills or using Facebook.

5         14.   In terms of whether anyone on my team worked overtime, I didn't

6   believe that they did. For example, even if an ISC was on site for a longer period of

7   time, I didn't factor in how many breaks they took, whether they spent an hour on

8   Facebook, whether they took an extra-long lunch. So even if the shift looked like a

9   longer amount of time, there was no way for me to know whether they were

10   actually working overtime or whether they chose to stay later because they had

11   taken additional time over and above their lunch and breaks in order to handle

12   personal matters during the day

13         15.   In about 2014, the company rolled out a new timekeeping system

14   through ADP. My understanding was that ADP would enter a default schedule for

15   ISCs, but they were informed that they could and should go into ADP and adjust

16   those entries if their actual working hours differed. I believe at that time, ISCs' time

17   entries could be released directly to payroll—I don't remember having to approve

18   their time entries. None of my ISCs ever told me they worked overtime or requested

19   overtime. I'm not aware of whether any of my ISCs made adjustments to their time

20   entries in the ADP system in 2014 to reflect that their working hours were different

21   from the default entries.

22         16.   In January 2015, we rolled out a new timekeeping system called

23   Workday and trained on it through in-person trainings with ISCs. ISCs were trained

24   to enter their start time, end time, and the start time and end time of their lunch

25   breaks. At first, we trained people verbally that they were required to take a one-

26   hour lunch and were required to take it before the fifth hour. At that time, I would

27   generally watch the clock and if people didn't appear to have left for their lunch

28   break by a certain time, as the 5th hour approached, I would basically tell everyone

3857910v1/014495

5

to wrap up their calls and leave their desk. As the year went on, ISCs complained about that approach and said they wanted the option to take a 30-minute lunch rather than an hour. I relaxed my approach in that respect and allowed ISCs to take a 30-minute lunch at their discretion rather than an hour, so long as they entered their time appropriately in Workday.  Since Workday has been implemented, I have had ISCs request overtime and have granted requests to work overtime. Under the new system, ISCs are told that they need to request permission in advance in order to work overtime. But if they did work overtime, and didn't ask permission, we would still pay them the overtime but coach them on how to give notice in the future.

17.    Now that I've been a Senior Manager for a while, I've come to see that every team of ISCs at Zillow is very different depending on the approach that team's manager takes. Each manager has a different style in terms of how they run their team, the verbal messaging they deliver to ISCs, their system for maintaining accountability over performance metrics, and a number of other issues. In a way, each team of ISCs at Zillow can feel like a different office.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13ᵗʰ day of October, 2015 at Irvine, California.


_____
Jami Thomas

3857910v1/014495

6

**CONFIDENTIAL**                                              **Zillow-IF 000237**

**Disclosure Statement**

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE.  If you are willing to sign and submit an affidavit we will assist you in preparing the draft affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign.  We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 10/13/2015

(Signature)

**CONFIDENTIAL**                                   **Zillow-IF 000239**

# Exhibit 29

1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3              **SOUTHERN DIVISION**

4

5   IAN FREEMAN, an individual and as
    the representative of a class of similarly

6   situated persons,

7           Plaintiff,           Case No. SACV 14-01843 JLS (DFMx)
    v.

8   ZILLOW, INC., a Washington
    corporation; and DOES 1 through 50,

9   inclusive

10         Defendants.

11        **DECLARATION OF ARTHUR VALENZUELA**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

I, Arthur Valenzuela, state as follows:

1.     My name is Arthur Valenzuela, but I go by Art.  I am over the age of 18.  The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would and would testify to all matters set forth herein.

2.     I live in Portola Hills, California.

3.     I am currently a Business Consultant at Zillow in its Irvine office. Before August of this year, my title was Inside Sales Consultant. I have been at the company since June 2014. As an Inside Sales Consultant, my job was to sell marketing to real estate agents and help real estate agents grow their business using the best marketing platform in the country. I have been in the real estate industry for 22 years and wouldn't be at Zillow if I didn't believe in the product. I am also a licensed real estate broker in California.

4.     I am on Eddie Cornelius's team and have been since October of last year. Before that, I was on Jami Thomas's team. The sales floor at Zillow is an open office, so you sit at your desk with a group clustered together and that's your team and you have a manager.

5.     In the past, we used to sell advertising to any clients anywhere in the country and Puerto Rico. But since August 24, 2015, we have moved to a regional model instead. I serve the Southwest Region, which includes clients in California, Nevada, Utah, Hawaii, Arizona, and I think Alaska as well. Before this model, I would sometimes come in earlier in the day so I could make calls to the east coast. But now that I work the Southwest Region, I don't do that anymore as much. Also, now that I'm a Business Consultant I no longer do cold-calling or take inbound sales leads. All of my customers are already advertising with Zillow and the only new customers I get are ones who are referred by my existing book of clients.

CONFIDENTIAL                                          Zillow-IF 000189

6.      I feel like I'm in charge of how I want to run my day. I have certain metrics that are my targets in terms of sales numbers, call time, and dials. But I get to decide how I want to structure my day.

7.      Now I use a timekeeping system called Workday. I have to enter my time, including when my day starts, when my lunch break starts, when my lunch break ends, and when my day ends. Before Workday, I think there was an ADP system. When ADP was in place, I barely learned how to use the app for it on my phone before they switched to Workday.

8.      My understanding of lunch breaks is that I can take either a 30 minute lunch break or an hour lunch break. And whichever one I take, I have to enter it in Workday. We're encouraged to take our lunch breaks at around 11:00 a.m. or 11:30 a.m. Before Workday, I also understood that I had an hour of lunch break time and I could take it whenever I wanted to.

9.      I'm a very busy person. So during most of my lunch breaks, I try to find a little cubby or conference room in the building, take my lunch in there, and do some personal work on my iPad or cell phone separate from my Zillow work. I do that because that's my choice, not because anyone makes me stay. If I wanted to leave the building to go somewhere for lunch, I can always do that.

10.     Sometimes Zillow brings in catered lunch into the breakroom. I like to eat it when it's there—I'm grateful that they provide lunch so I take advantage of it. But I never feel pressured that I have to stay and eat that lunch. If I would rather go somewhere else for my lunch break, I could do that instead. Or, I could grab some food, and still leave and take my lunch break outside of the building if I wanted to run an errand or something. I have done that a few times.

11.     In terms of rest breaks, I personally feel that I have the freedom to take however many rest breaks I need to. I don't think there's a formal rule or anything like that which says when I take them or how long they are. I usually take 3-4 rest breaks per 8-hour workday. Usually my rest breaks are around 10 minutes.

3

**CONFIDENTIAL**                                              **Zillow-IF 000190**

1    Sometimes they might be up to 15 minutes, but not that often. On my rest breaks, I
2    like to take a walk, clear my head, reset so that I feel fresh.

3         12.    One hundred percent I never felt pressured to enter my time differently
4    from what I'm really doing. I never felt pressured to skip lunch or breaks. Zillow
5    encourages me to take at least a half-hour lunch break and up to an hour.

6         13.    I learned about the lunch break rules and about rest breaks over time
7    because it's evolved. I think when the Workday change happened, there were some
8    emails about how to enter lunch time. But before emails, I probably learned what to
9    do verbally through trainings or orientation or from my manager. And lunch breaks
10   were always part of the culture here. Even before the Workday system, Zillow
11   always made clear that we need to take lunch and breaks. As sales consultants, you
12   need to reset yourself constantly to be successful.

13        14.    My sales approach is completely my discretion as to how to do it. I get
14   a lot of guidance, coaching, training, and people I can ask questions to. But I decide
15   what to say when I'm pitching a client. There's no script. Zillow lets me be who I
16   am and run my own business.

17        15.    In the new regional model, as a business consultant, I deal mostly with
18   people who are already advertising with us. The whole purpose of my job in the
19   regional model is I can spend a lot more time with clients rather than cold-calling. I
20   can help clients learn their markets, learn their business practice, advise them,
21   especially as it relates to contacts over the Internet. My new job is really about
22   giving advice and recommendations to clients.

23        16.    In terms of overtime, now my understanding is if I work more than 8
24   hours, I have to check and get permission from my manager. I do that sometimes
25   and I have gotten approval. Before the Workday system, it wasn't as structured. I
26   never felt pressured by managers or anyone else that I had to work overtime.
27   Sometimes I probably stayed longer than 8-hours. I don't really know if my
28   manager knew how much I was working on any given day because there's a lot of

4

freedom to take whatever breaks you need, get up and leave your desk, and come back, and I wouldn't feel the need to tell my manager whether I was working overtime. If I came in at 7 a.m., I would usually leave around 4 or 4:30 p.m., and usually I took a 30 or 60 minute lunch break. I would try to get my 8 hours of work in. If I was taking a very short day, like a half day because of a doctor's appointment, I would obviously tell my manager. But otherwise, I never really felt I had to say when I was coming or going and so I didn't really do that.

17.    I never felt like Blitzes interfered with my lunch or rest breaks. As a business consultant, I never Blitz anymore. But even when I was an Inside Sales Consultant, I pretty much always knew when the Blitzes were ahead of time so I could plan my rest breaks and lunch break around it. We would often have Blitzes for one hour, from 8:30 a.m. to 9:30 a.m. or about then, and again from 1:00 p.m. or 1:30 p.m. for another hour. So I could still take my lunch break when I wanted to before 1:00 p.m. and I could take rest breaks whenever. If I need to use the restroom during a Blitz, I can do that. Sometimes my manager tells me I sound better on calls when I stand, so I would do that during a lot of Blitzes. But if I needed to sit down for some reason, I didn't think that would be a problem. I hurt my knee a while back and so sometimes I needed to sit down and no one ever made me feel that was wrong or any pressure to stand up.

18.    I have always felt that Zillow was a very positive environment. I have always felt encouraged, motivated, and inspired in this company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of September, 2015 at Irvine, California.

Arthur Valenzuela

5

**CONFIDENTIAL**                                                        **Zillow-IF 000192**

### Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

• Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

• Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

• Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

• It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

• You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

• If you decide to speak with us, you may change your mind at any time and stop our conversation.

• At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

• You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE. If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign. We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: _____9/16/15_____          _____
                                                   (Signature)

**CONFIDENTIAL**                                    **Zillow-IF 000194**

# Exhibit 30

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA**

3    **SOUTHERN DIVISION**

4

5    IAN FREEMAN, an individual and as
     the representative of a class of similarly

6    situated persons,

7              Plaintiff,                          Case No. SACV 14-01843 JLS (DFMx)

     v.

8    ZILLOW, INC., a Washington
     corporation; and DOES 1 through 50,

9    inclusive

10             Defendants.

11                  **DECLARATION OF ADAM WEERSING**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

I, Adam Weersing, state as follows:

1. My name is Adam Weersing. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2. I started in inside sales on October 13, 2014. My manger has always been Ed Oh. Ed is one of the more casual managers based on what I'm told and the way that we work together. I have had no problems with Ed taking time off or vacations or meal or rest breaks. I recently had a child and he was born October 26, 2014 and I've had no push back from Ed about taking leave for that and I have had no problems with Ed with any of those issues including breaks.

3. I typically go to the break room to eat lunch and feel like I can go whenever I want to. There was a time not long ago that there were specific lunch times that they wanted me to take a lunch at around 11:30 am if we were in at 8 am but that didn't work out for me because it was too early for me to eat lunch because I eat breakfast at 9 or 9:30 am. We still took a lunch break at 11:30 am or so but I didn't like to because of the timing.

4. For a while, I had no scheduled shift at all and I could come in whenever I wanted to, whether it was at 6 am or even as late as 9 am. It was kind of nice coming in at 6 a.m. because then I could leave at 2:30 pm and go play a round of golf.

5. In my experience at Zillow, you do not have to work through your lunch ever. That includes if I choose to get the free lunch when lunch is catered. Sometimes I chose to eat that catered lunch at my desk but that was my choice. To say that I was "required" to eat at my desk if I took the catered lunch is ridiculous and not my experience at least.

6. I sometimes take my lunch break across the street at the marketplace where there are a bunch of restaurants like Which Which and Wahoo's Fish Taco and other places.

**CONFIDENTIAL**                                                          **Zillow-IF 000196**

7.    Before becoming an account executive, I was able to come and go as I please during the work day here at Zillow.

8.    There was no clock in system when I started, and if I stayed extra during that time period it was my choice. I did not even know there was a time system here at Zillow before Workday and am not familiar with ADP here at Zillow and the time system was the least of my personal worries here during my training.

9.    There no longer is a 210 call time requirement.

10.    I generally do not take my rest breaks and that's my choice.  If I wanted to wander around the building for 15 minutes for a rest break, then I could. I am here to work, put up numbers, and go home.   I have had no problems with taking breaks, taking lunches when I wanted to, coming and going as I please, and making my numbers.  And I can see that if people did have problems with that, then maybe they had problems hitting their sales numbers.

11.    I am currently an account executive.  I field new inbounds, new clients, and anyone who wants to set up.   Reaching 210 minutes is a snap now but there is no 210 minute requirement.  So now I do not have to cold-call as much because now I am responding to people who are inquiring who want to talk to you versus getting called out of the blue.  I cover the west region – California, Nevada, Alaska, Hawaii, and Arizona.  There are a lot of inbounds a day and lot of people that want to talk to you.  And in the new position for me there is no formal blitz because you are so busy.

12.    Yesterday, there was an all-day wave with a lot of inventory that was released and you are going to be busier on such a day and I could still take my breaks when I wanted to and did.

13.    We are all here as a team, and you are building your own destiny.

14.    Workday is a great system and it's simple to operate.

3

**CONFIDENTIAL**                                                        **Zillow-IF 000197**

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3

4

5

6    Executed this 16th day of September, 2015 at Irvine, California.

7

8

9                                    Adam Weersing

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**Disclosure Statement**

We are lawyers from the law firm Susman Godfrey L.L.P. We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit. Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

- Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

- Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

- Susman Godfrey represents the Company. We do <u>not</u> currently represent you or other Inside Sales Consultants.

- It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit. That decision is solely yours to make.

- You have the right to decide not to speak with us. There will be no adverse consequences if you choose not to speak with us. Similarly, there will be no benefits or rewards for agreeing to speak with us.

## YOU DO NOT HAVE TO SPEAK TO US

- If you decide to speak with us, you may change your mind at any time and stop our conversation.

- At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided. We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

- You do not have to sign any affidavit if you do not want to. There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

2527077v1/013096

## YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE.  If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign.  We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: 9/16/15

_____
(Signature)

Adam Weersing

880731v1/010993
2527077v1/013096

2

# Exhibit 31

DocuSign Envelope ID: 2CF4266F-69CE-47C0-8242-973506DF5AA9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

IAN FREEMAN, an individual and as the representative of a class of similarly situated persons,

        Plaintiff,

v.

ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive

        Defendants.

Case No. SACV 14-01843 JLS (DFMx)

## DECLARATION OF CHRISTOPHER WELCH

1

DocuSign Envelope ID: 2CF4266F-69CE-47C0-8242-973506DF5AA9

I, Christopher Welch, state as follows:

1. My name is Christopher Welch. I am over the age of 18. The statements contained in this declaration are based on my own personal knowledge, and if called upon as a witness, I would testify to all matters set forth herein.

2. I used to work at Zillow as an Inside Sales Consultant ("ISC") in its Irvine, California office. I began working there in February 2013 and continued to work for Zillow through early 2014 (I believe it was February 2014). I started on Andres Madsen's team. Then I was transferred to Cody Fagnant's team. I had a wonderful experience at Zillow—it is the best company I have ever worked for. I didn't want to leave the company, but I had a very long commute that was negatively impacting my health and so I had to make a change. As an ISC, my job was to sell Zillow's premier agent program to real estate agents throughout the country and maintain those accounts and client relationships.

3. When I heard about Mr. Freeman's lawsuit against Zillow, I was very surprised. My experience at Zillow was very different from what he describes. I knew Mr. Freeman and he always came across as someone who was happy at Zillow as well.

4. When I first started working at Zillow, I commuted from Santa Ana, California into the Irvine office, which wasn't so bad—it was a 10 minute drive or so. My usual working hours were probably 7:00 a.m. to 4:00 p.m., give or take. But after a while, I had to move to Palmdale, California. Because the commute to and from Palmdale was so long, I would wake up at 2:00 a.m., drive to Irvine and get into the office sometime around 5:00 a.m. and I made sure to leave around 3:30 p.m. so that I wouldn't run into horrible traffic on the way home (often I did anyway).

5. I usually liked to get into the office in the morning and work for a few hours before taking a 15-minute break. I could have taken breaks even earlier, but I liked to wait a little bit so I could feel like I was building momentum in my day in

2

DocuSign Envelope ID: 2CF4266F-69CE-47C0-8242-973506DF5AA9

terms of sales. During my break, I would just get up, walk around, go downstairs and walk outside, grab a drink from the kitchen—basically just try to reset mentally. I would usually take a break in the afternoon as well, maybe around 2 or 3 p.m. depending on how I was feeling. Again, I liked to take about 15-minutes to walk around and clear my head. I'm a big caffeine guy, so I would take a break to go grab a coke.

6.      Around 12:00 or 1:00 p.m., I would take my lunch. I never liked to take my lunch before 12:00 p.m. If I felt like I was in a rhythm with my customers, I wanted to keep that going until the normal lunch hour. I was never forced to do that, it was just my choice. I believe if I wanted to take my lunch earlier or later, I had total discretion when to take it. The only slight exception to that is we would sometimes have what are called "Blitzes" during the day, which can be anywhere from 30 minutes to an hour of focused selling activity. I could always plan my lunches and breaks around the Blitz and they never interfered with my ability to take a break or lunch. During my lunch break, I would go out for lunch or go eat in my car—I liked to get away from the office to get away from the hustle and bustle of the noise so I could mellow out and reset. I liked to take a walk to restaurants that were nearby. I think I probably took lunches that were about half an hour long, but I did take hour lunches sometimes, especially if I needed to run an errand. It would be impossible for me to know exactly how long my lunches were each day because every day was different.

7.      I never once felt pressured by anyone at Zillow to skip a lunch, work through lunch, skip breaks, or work overtime. I felt like I was treated like an adult and I had freedom to manage my day. I could decide what time to come in during the morning, when to take my lunch, and when to leave. I feel like I generally worked 8 hours not including my lunches and breaks. I suppose it's possible that on some days, maybe I cut my lunch short or something like that. But if I did, it was totally my choice. I'm not even sure how my managers could have known if I was

**CONFIDENTIAL**                                                      **Zillow-IF  001824**

DocuSign Envelope ID: 2CF4266F-69CE-47C0-8242-973506DF5AA9

1    doing that because everyone is constantly in and out and we have freedom to take

2    our breaks whenever we want. So even if I only took, say, a 30-minute lunch break,

3    I had the freedom to take the other 30-minutes and break it up into smaller breaks

4    throughout the day. And sometimes I would do that—if I was having a rough day in

5    terms of sales, I would take more frequent breaks throughout the day to try to reset

6    my "sales mojo." We were free to decide how to divide up and take our lunches (or

7    take it all at once). I didn't think there were any rules about limiting our break time.

8    The message I received in training was that every person is different and needs

9    different things to perform their best. So I had the freedom to schedule my hours

10   how I wanted to, take breaks when I wanted to, and manage my day so that I felt

11   good and had every opportunity and tool to succeed. I felt like Zillow gave me as

12   much freedom as possible.

13        8.    When it came to lunches and breaks, my impression was that Zillow

14   trusted its ISCs to give them almost total discretion on how to manage their lunches

15   and breaks (perhaps with the exception that you should try not to schedule them to

16   conflict with a company-wide meeting or a Blitz). I never felt like there was a limit

17   to how many breaks you could take or how long they could be. Some ISCs I knew

18   were smokers (actually, a lot of them) and it looked like they took a break from the

19   floor maybe every hour.

20        9.    I never felt like there was indirect pressure through the job to skip

21   lunches or breaks. I know some people complained about the requirement that you

22   spend at least 210 minutes on the phone in "call time." But I never felt like it was

23   difficult to hit that number in a normal, 8-hour workday and I never felt that it

24   interfered with breaks or lunches. In my mind, that's about 3.5 hours out of an 8

25   hour workday that Zillow wanted us to be on the phone. But that was the largest

26   component of our job—being on the phone! I don't think it's too much to ask that

27   less than half the workday be spent on the phone and it's tough for me to

28   understand why that would limit anyone's ability to take breaks or lunches.

4

**CONFIDENTIAL**                                      **Zillow-IF   001825**

DocuSign Envelope ID: 2CF4266F-69CE-47C0-8242-973506DF5AA9

10.    I personally have certain principles that are offended when I feel someone has been wrongly accused. Based on my time at Zillow, it's difficult for me to understand the allegations that Mr. Freeman made—they are so completely at odds with everything that I experienced.

Executed this 12th day of November, 2015 at Palmdale, California.

_____

Christo~~~~~~~~~~~

**CONFIDENTIAL**                                          **Zillow-IF  001826**

DocuSign Envelope ID: 615CB4BD-D485-4B8E-98D3-05CD32D6EB83

## Disclosure Statement

We are lawyers from the law firm Susman Godfrey L.L.P.  We represent Zillow, Inc. (the "Company"), in a lawsuit entitled *Ian Freeman v. Zillow, Inc.* We are asking you to speak with us and perhaps others hired by us today about matters relating to that lawsuit.  Before you decide whether to speak with us, it is important that you understand certain things about this lawsuit, your relationship to it and the role of Susman Godfrey L.L.P.

•     Mr. Freeman ("Plaintiff") seeks to represent a class of "current and former non-exempt hourly employees who are or were employed by Zillow in California as an Inside Sales Consultant who worked a scheduled shift beginning approximately between 8:00 a.m. and 4:00 p.m. at any time beginning four years preceding the filing of the Complaint in this action through settlement or final judgment in this action." Plaintiff seeks to bring claims on his own behalf and on behalf of the putative class for alleged meal and rest break violations, unpaid wages, overtime violations, wage statement violations, unfair business practices, and associated penalties. For more information regarding Plaintiff's claims, you are welcome to review Plaintiff's Second Amended Complaint, Initial Disclosures, and Responses to Zillow's First Set of Interrogatories, which we have made available for your review.

•     Although you are not a named party to this lawsuit, it is possible that your interests in the lawsuit and those of the Company may be adverse. Should Plaintiff prevail in the lawsuit, it is possible that you would be entitled to substantial monetary damages.

•     Susman Godfrey represents the Company.  We do <u>not</u> currently represent you or other Inside Sales Consultants.

•     It is not our purpose to discourage you or others from participating in the lawsuit in any way you see fit.  That decision is solely yours to make.

•     You have the right to decide not to speak with us.  There will be no adverse consequences if you choose not to speak with us.  Similarly, there will be no benefits or rewards for agreeing to speak with us.

---

## YOU DO NOT HAVE TO SPEAK TO US

---

•     If you decide to speak with us, you may change your mind at any time and stop our conversation.

•     At the conclusion of our discussion we may ask you to prepare and sign an affidavit (written statement under oath) summarizing the information you have provided.  We intend to present these affidavits to the Court in the lawsuit in support of the Company's defense in this case.

•     You do not have to sign any affidavit if you do not want to.  There will not be any adverse consequences to you if you decide that you would rather not sign an affidavit.

3980295v1/014495

**CONFIDENTIAL**

**Zillow-IF  001827**

DocuSign Envelope ID: 615CB4BD-D485-4B8E-98D3-05CD32D6EB83

# YOU DO NOT HAVE TO SIGN AN AFFIDAVIT

- ANY AFFIDAVIT THAT YOU SIGN MUST BE COMPLETELY TRUTHFUL AND ACCURATE.  If you are willing to sign and submit an affidavit we will assist you in preparing the affidavit, but it is up to you to review the draft affidavit very carefully and ensure that it is accurate in every respect before you sign.  We do not want you to sign and submit any affidavit unless you are comfortable in doing so and you are satisfied that the affidavit is completely truthful and accurate.

- By signing this document, you acknowledge that: (1) you have received, read and understand this Disclosure Statement; (2) you understand that you are a potential member of the plaintiff class in the lawsuit and that any information you provide may be used by the Company in its defense against that lawsuit; and (3) any information you provide to us is provided of your own free will, voluntarily, without coercion or influence, without concern that any refusal to do so will adversely impact your employment with the Company, and without promise of any benefit or reward.

Dated: _____          _____

                                         (Signature)



880731v1/010993

2

**CONFIDENTIAL**                          **Zillow-IF  001828**