1
2
3
4
5
6             UNITED STATES DISTRICT COURT
7             CENTRAL DISTRICT OF CALIFORNIA
8               SOUTHERN DIVISION
9
10

| | |
|---|---|
| IAN FREEMAN, individually and as the representative of a class of similarly situated persons,<br><br>   Plaintiff,<br><br>  vs.<br><br>ZILLOW, INC., a Washington corporation, and DOES 1-50, inclusive,<br><br>   Defendants. | CASE NO. 8:14-cv-01843-JLS-DFM<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND INCENTIVE AWARD (Doc. 143, 145)** |

1    Before the Court are two unopposed Motions filed by Plaintiff Ian Freeman.  The
2    first motion seeks final approval of the class action settlement (Final Approval Mot., Doc.
3    145), and the second motion seeks approval of the requested attorneys' fees, costs, and
4    service award (Fee Mot., Doc. 143).  Having reviewed the papers, held a fairness hearing,
5    and taken the matter under submission, the Court GRANTS the Motion for Final Approval
6    of the Class Action Settlement and GRANTS the Motion for Attorneys' Fees, Costs, and
7    Service Award, with certain modifications.

8    **I.    BACKGROUND**

9         **A.    Procedural History**

10        In this wage-and-hour class action, Freeman alleges that Zillow, an online home and
11   real estate marketplace, engaged in a "systematic scheme of exploiting and intimidating its
12   employees" to skip meal and rest breaks and work overtime without compensation.  (SAC
13   ¶ 1, Doc. 45.)   In his Second Amended Complaint, Freeman advances claims for (1)
14   failure to pay wages (Cal. Labor Code §§ 1194, 1194.2), (2) failure to pay overtime wages
15   (Cal. Labor Code § 510), (3) failure to provide meal and rest breaks (Cal. Labor Code §
16   226.7), (4) waiting time penalties (Cal. Labor Code § 203), (5) failure to provide accurate
17   wage statements (Cal. Labor Code §§ 226(a), (e)), (6) unfair business practices under the
18   Unfair Competition Law (Cal. Bus. Prof. Code § 17200, *et. seq.*), (7) willful violations of
19   the Fair Labor Standards Act (29 U.S.C. § 201, *et. seq.*), and (8) violations of the Fair
20   Labor Standards Act (29 U.S.C. § 201, *et. seq.*).  (SAC ¶¶ 55–110.)

21        On February 6, 2016, the Court granted Plaintiff's Motion for Class Certification.
22   *See generally Freeman v. Zillow, Inc.*, No. SACV 14-1843-JLS-DFMX, 2016 WL
23   6080208 (C.D. Cal. Feb. 26, 2016).  While granting class certification, the Court narrowed
24   the proposed class definition to:

25        Class: Current and former non-exempt hourly employees who are or were
26        employed by Zillow, Inc. in California as an Inside Sales Consultant, who
27        worked a shift scheduled between 8:00 a.m. and 4:00 p.m. during the period

28

November 19, 2010 through January 4, 2015 and who did not execute a
Separation and Release of Claim Agreement after ending their employment.

Subclass: Former non-exempt hourly employees who were employed by
Zillow, Inc. in California as an Inside Sales Consultant, who worked a shift
scheduled between 8:00 a.m. and 4:00 p.m. during the period November 19,
2010 through January 4, 2015 and who did not execute a Separation and
Release of Claim Agreement after ending their employment.

*Id.* at *7.

After the Court granted class certification, Zillow filed a motion for partial
summary judgment and decertification of the class. (Mot. Summary Judgment, Doc. 79;
Mot. Decert. Class, Doc. 81.) One month later, on May 6, 2016, the parties apprised the
Court that they had reached a proposed class action settlement agreement. (Notice, Doc.
97.) After the parties spent several months ironing out the details of the agreement and
obtaining approval from the Department of Labor, Freeman filed his Motion for
Preliminary Approval on December 2, 2016. (Mot.; *see* Stip. Order, Doc. 106; Stip. Order,
Doc. 108; Stip. Order, Doc. 110; Decl., Doc. 113.) Following two rounds of supplemental
briefing and several amendments to the Settlement Agreement, the Court conditionally
certified the class and granted preliminary approval to the Settlement Agreement on May
10, 2017. (Preliminary Approval Order, Doc. 139; Suppl. Order, Doc. 142.)

## B.  **The Settlement**

The Settlement Agreement provides for a gross settlement fund of six million
dollars. (SA § 5.1, Exh. C, Doc. 141-3.) The gross settlement fund shall be reduced by a
*pro rata* amount for each class member who opts out of the Settlement Agreement, but any
amount not awarded in attorneys' fees or as an incentive award will not revert to Zillow.
(*Id.* §§ 2.8, 5.1.1., 5.1.2, 5.1.3, 7.1.12.) After deducting administrative costs, penalties,
attorneys' fees, and any incentive award, the net settlement amount will be apportioned to
class members based on five main and three minor allocations. (*Id.* § 5.1.1.) The first

3

allocation, known as the FLSA overtime allocation, awards class members (1) one-half times their regular rate of pay (2) multiplied by an assumed 6.29 hours per workweek (3) multiplied by two for every week class members worked for Zillow from March 1, 2013 through February 28, 2015.  (*Id.* § 5.1.1(a).)  To recognize the longer statute of limitations that California class members enjoy for their state law overtime claims, the second allocation provides California class members one-half times their regular rate of pay multiplied by an assumed 6.29 hours per workweek (plus interest) for every week California class members worked from November 19, 2010 through February 28, 2013. (*Id.* § 5.1.1(b); Prelim. Mem. at 12–13.)  The third and fourth allocations award California and Washington class members one-half times an assumed two hours per workweek (plus interest) for any week class members worked from March 1, 2015 through February 29, 2016.  (SA §§ 5.1.1(c), (d).)  These allocations are intended to compensate class members "to the extent that they may allege that they nevertheless underreported their overtime" in the new timekeeping system.  (Prelim. Mem. at 12.)  To compensate California class members for their meal-and-rest-break claims, the fifth allocation awards California class members their average rate of pay multiplied by an assumed one hour per workweek for every week they worked from November 19, 2010 through February 29, 2016.  (SA § 5.1.1(e).)  The three minor allocations reserve $30,000 for California class members' wage-statement claims (apportioned on a *pro rata* basis among California class members), $25,000 for California class members' waiting time claims (apportioned on a *pro rata* basis among California class members), and $80,000 for class members who worked for Zillow between March 1, 2016 and the date of preliminary approval (apportioned on a weighted basis based on the number of weeks worked).  (*Id.* §§ 5.1.1(f), (g).)  To the extent that the aforementioned allocations exceed or do not exhaust the net settlement fund, a multiplier will be applied to the allocations other than the FLSA overtime allocation to ensure that the net settlement fund equals the allocations.  (*Id.* §§ 5.1.1(h).)

After the First Stipulated Amendment, the Settlement Agreement defines the class as:

[A]nyone who has been employed by Zillow, Inc. as an Inside Sales Consultant, Senior Inside Sales Consultant, Business Consultant, Business Consultant I, Business Consultant II, Senior Business Consultant I, Sales Executive I, Sales Executive II, Senior Sales Executive 1, Special Products Sales Executive, Account Manager (Travel Team), Account Manager (In Market Sales), Sales Coordinator, Sales Event Coordinator, In-Market Sales Executive, Senior In-Market Sales Executive, and Team Lead, in (a) the State of California from November 19, 2010 through the date on which the Court may grant preliminary approval ("California Class Members") or (b) the State of Washington from March 1, 2013 through the date on which the Court may grant preliminary approval ("Washington Class Members").

(SA First Amend. § 2.1, Exh. C, Doc. 141-3.)  The class does not include those who opt out or Rachel Kremer, Jennifer Young, Ashley Boehler, James Friedrich, Reginald Peterson, Stephen Johnson, Michael Kerr, Ryan Seda, or Jason Youseph.  (*Id.*)

In return for receiving a share of the settlement, class members will release Zillow (and related persons and entities) from:

[A]ny and all claims, rights, penalties, demands, damages, debts, accounts, duties, costs (other than those costs required to be paid pursuant to this Settlement Agreement), liens, charges, complaints, causes of action, obligations, or liability of any and every kind, whether known or Unknown Claims, that were alleged or could have been asserted based on the alleged facts in the Litigation and any claims relating in any way to any of the facts alleged or asserted or referred to in any of the pleadings and/or papers filed in the Litigation, namely:

(*Id.* § 8.1.)  Following "namely," the release provides a list of case documents, statutes, orders, and legal theories under which class members agree to waive their claims.  (*See id.*) Separately, Freeman agrees to waive any individual claim "arising out of or related to any act, omission, event, fact or other thing related to, or arising from his employment and/or

1   severance of employment with Zillow . . . ." (*Id.* § 8.5.)  The "Class Period" is defined as

2   "the period of time from (a) November 19, 2010, up through and including the date the

3   Court grants preliminary approval, for California Class Members and (b) March 1, 2013,

4   up through and including the date the Court grants preliminary approval, for Washington

5   Class Members, which is the period of time applicable to the claims being released

6   pursuant to Section 8 hereafter." (*Id.* § 2.2.)

7          Class members will receive a settlement check dedicated to their share, if any, of

8   the FLSA overtime allocation (the FLSA Settlement Check) and a separate check for any

9   amount due under the other allotments (the Class Action Settlement Check).  (SA Second

10  Amend. §§ 2.18, 7.1.9, Exh. C, Doc. 141-3.)  With the FLSA Settlement Checks, class

11  members will also receive a DOL Form WH-58, which includes release language.  (*Id.* §

12  7.2.3.)  Besides this DOL form, the FLSA Settlement Checks will state: "I have received

13  and read the Class Notice in *Freeman v. Zillow, Inc.*  By negotiating this check, I consent

14  to join the FLSA collective action, elect to participate in the Settlement, and agree to

15  release my clams covered by the Settlement." (*Id.*)  By cashing or negotiating their FLSA

16  Settlement Check, class members shall be deemed to have opted into the FLSA collective

17  action.  (*Id.*)

18         Subtracting the amount requested in attorneys' fees, costs, an incentive award,

19  administrative expenses, and the PAGA remittance, class members would share

20  $3,907,500.  (Geragos Suppl. Decl. ¶ 7, Doc. 148.)  Under the Settlement Agreement's

21  allocation plan, the awards would range from $45.92 to $31,374.94, with the median award

22  equaling $3,480.36 and the mean award totaling $5,641.30.  (*Id.* ¶ 9; Settlement Award

23  Spreadsheet, Doc. 151-1.)  Excluding the proposed incentive award, Freeman's settlement

24  payment would be $17,842.24.  (Geragos Suppl. Decl. ¶ 7.)

25         **C.    Notice and Response**

26         Notice was sent to class members pursuant to the method approved by the Court.

27  The notice adequately describes the litigation and the scope of the involved class.  (Class

28  Notice, Exh. A, Doc. 145-1.)  Additionally, the notice explains (1) the amount and makeup

of the Settlement Fund, (2) the plan of allocation, (3) that Plaintiff's Counsel and Plaintiff will apply for attorneys' fees, costs, and a service award, and (4) class members' options to participate, opt out, opt in, or object to the settlement.  (*Id*.)

On May 24, 2017, Zillow transferred a data file to Garden City Group, LLC with the names, last known addresses, social security numbers, estimate awards, and employment dates for the 690 class members identified by Zillow's expert.  (Kierkegaard Decl. ¶ 1, Doc. 145-1.)  Garden City Group used the United States Postal Service's National Change of Address database to update the addresses for class members.  (*Id*. ¶ 4.) Through this process, Garden City Group updated seven class members' addresses.  (*Id*.) On June 2, 2017, Garden City Group mailed the class notice to the 690 class members through first class mail.  (*Id*. ¶ 5.)  For the 54 class notices returned with forwarding information, Garden City Group mailed the notices again.  (*Id*. ¶ 6.)  Garden City Group performed skip traces on the 119 class members whose Class Notices were returned without forwarding information.  (*Id*. ¶ 7.)  Through this process, Garden City Group was able to find new addresses for, and mail class notices to, 106 of these class members.  (*Id*.) Thus, the notice program reached approximately ninety-eight percent of class members. (*Id*.)

The class notice directs class members to a website operated by the claims administrator, www.InsideSalesConsultantSettlement.com, which provides information about the proposed settlement, important dates and deadlines, answers to frequently asked questions, and contact information for the claims administrator.  (*Id*. ¶¶ 8–10.)  Garden City Group has also launched a toll-free number that provides automated responses to questions about the Settlement Agreement and allows class members to leave voicemails. (*Id*. ¶¶ 11–12.)

Garden City Group has received no requests for exclusion and no objections to the Settlement Agreement.[1]  (*Id.* ¶¶ 14, 16.)  As requested, Class Counsel also submitted declarations from class members offering their impressions of the Settlement Agreement. One class member who will receive approximately $9,000 under the Settlement Agreement attests that she is "happy to see that employees' rights ultimately prevailed here" and that after the transition from the old timekeeping system, which she describes as "a total joke," inside sales consultants "were able to better record and much more accurately represent, for example, the overtime hours that we logged."  (Shokoohi Decl. ¶ 3, Doc. 148-1.)  She also attests that the transition led "to have a better work-life balance, since there was no longer any pressure and/or coercion by our employer to work beyond an 8-hour day without being appropriately compensated."  (*Id.*)  She believes that class members are "very pleased" to participate in this "very fair and hard-earned settlement."  (*Id.* ¶ 4.) Another class member asserts that the transition to Workday heralded a shift from a workplace environment that was "incredibly chaotic, relatively unregulated and disorganized[,] and extremely difficult for individuals" to one where "Zillow got serious about its employment practices and began to pay more attention to its employees and their needs."  (Simon Decl. ¶ 3, Doc. 148-5.)  She describes the settlement as "very fair" and believes "that Class Counsel worked very hard in securing it for myself and other class members."  (*Id.* ¶ 5.)  Other former Zillow employees, including ones who worked for the company after the implementation of the new timekeeping system, similarly view the agreement as fair and support final approval.  (Murphy Decl. ¶¶ 2–3, Doc. 148-3; Grisard Decl. ¶¶ 3–4, Doc. 148-7; Garcia Decl. ¶¶ 2–3, Doc. 148-2; Nguyen Decl. ¶¶ 2–3, Doc. 148-9; Krause Decl. ¶¶ 2–3, Doc. 148-8 (affirming that he is "thrilled" by the settlement amount and believes Workday allowed him to "to keep track of all overtime hours worked,

---

[1] The Kierkegaard Declaration incorrectly states that class members had 30 days from Garden City Group's mailing of the class notice to object or opt out (Kierkegaard Decl. ¶¶ 13, 15); the Court extended the deadline to 45 days (Order at 28, Doc. 139).  Nevertheless, the Kierkegaard Declaration indicates that it received "no timely or late" objections or requests for exclusion (Kierkegaard Decl. ¶¶ 14, 16), and the class notice correctly indicated that class members had 45 days to respond (Class Notice, Exh. A).

rather than be subjected to the standard pre-punched 8-hour system").)  Current Zillow employees, while voicing more skepticism about the underlying merit of this action, likewise view the settlement as fair and support final approval.  (Tyby Decl. ¶¶ 2–4, Doc. 148-4; Cervinka Decl. ¶¶ 3–5, Doc. 148-6; Kierkegaard Suppl. Decl. ¶ 4, Doc. 148-10.)

Plaintiff now moves for final approval of the class action settlement and seeks an award for attorneys' fees of $1,965,311.49, costs of $34,688.51, settlement administration expenses of $47,500, and a service award of $15,000 for Freeman.  (Final Approval Mot.; Fee Mot.)

## II. <u>CERTIFICATION OF THE CLASS AND COLLECTIVE ACTION</u>

In its Preliminary Approval Order, the Court discussed the propriety of conditional class and collective action certification for the purpose of settlement.  (Prelim. Approval Order at 9–17; *see also* Order at 1, Doc. 142 (accepting amendments).)  The Court also discussed the adequacy of Plaintiff as Class Representatives and Plaintiff's Counsel as Class Counsel.  (Prelim. Approval Order at 14, 16.)  The Court sees no reason to depart from its previous conclusions regarding the certification of a settlement class and collective action, its appointment of Plaintiff as Class Representative, or its appointment of Class Counsel.  The Court, therefore, incorporates its class and collective action certification analysis from the Preliminary Approval Order into this Order and certifies the class and collective action for the purpose of settlement only.

## III. <u>FINAL APPROVAL OF CLASS SETTLEMENT</u>

### A. <u>Legal Standard</u>

Before approving a class-action settlement, Rule 23 of the Federal Rules of Civil Procedure requires the Court to determine whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2).  "To determine whether a settlement agreement meets these standards, a district court must consider a number of factors, including:  [1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the

stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (citation omitted). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness, and the settlement must stand or fall in its entirety." *Staton*, 327 F.3d at 960 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

In addition to these factors, where "a settlement agreement is negotiated prior to formal class certification," the Court must also confirm that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946–47 (9th Cir. 2011) (citations omitted) (emphasis in original). Accordingly, the Court must look for explicit collusion and "more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. Such signs include (1) "when counsel receive a disproportionate distribution of the settlement," (2) "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal citations and quotation marks omitted).

**B.     Discussion**

The Court finds that the factors listed above favor final approval of the proposed settlement.

**1.  Strength of Plaintiff's Case**

As noted in the Court's Preliminary Approval Order, the principal claims at issue involve Zillow's alleged failure to pay Inside Sales Consultants overtime and provide

1  California class members with meal and rest breaks.  Plaintiff's evidence that Zillow's

2  earlier timekeeping system resulted in extensive overtime violations is rather strong, *see*

3  *Freeman*, 2016 WL 6080208, at *4, while there is little evidence that these failures

4  continued after Zillow implemented Workday (*see* Geragos Second Suppl. Decl. ¶¶ 4–15,

5  Boehler Decl. ¶¶ 4–5, Exh. 1, Doc. 135-1; Anderson Report, Exh. 2, Doc. 135-2; Connor

6  Decl. ¶¶ 9–10, Exh. 3, Doc. 135-3).  Zillow fiercely contested its liability—particularly on

7  the meal-and-rest-break and PAGA claims—and filed a motion for partial summary

8  judgment.  (*See generally* Mem. Summary Judgment, Doc. 80.)  In opposition to class

9  certification, Zillow also submitted declarations from several employees asserting that they

10 were not pressured to miss their meal and rest breaks.  *See Freeman*, 2016 WL 6080208, at

11 *4.  The strength of class members' overtime claims are clearly reflected in the substantial

12 monetary payout class members stand to receive under the Settlement Agreement.  (*See*

13 Geragos Suppl. Decl. ¶¶ 5, 8–10, Doc. 128-1.)  California class members faced greater

14 obstacles in proving their state law meal-and-rest-break claims, and this settlement allows

15 class members to avoid the costs of a trial and lengthy appeals process.  Thus, while class

16 members have strong pre-Workday implementation overtime claims, the time and expense

17 associated with continuing to prosecute this suit weigh in favor of granting final approval.

### 2.  Risk, Complexity, and Likely Duration of Further Litigation

19        In his Memorandum, Freeman observes that "there is no doubt that continued

20 litigation of the issues in this complex wage and hour matter would be burdensome

21 costly."  (Final Approval Mem. at 10–11.)  The Ninth Circuit granted Zillow's petition for

22 interlocutory review of the Court's certification of Plaintiff's meal-and-rest-break claims,

23 and Zillow filed a motion for decertification of the class and partial summary judgment.

24 Assuming Freeman would prevail on both fronts, class members would still have to

25 succeed at trial and on appeal.  (*Id.* at 9–11.)  Settlement eliminates the risks inherent in

26 certifying a class, prevailing at trial, and withstanding any subsequent appeals, and it may

27 provide the best opportunity for class members to obtain relief.  This factor, therefore,

28 weighs in favor of granting final approval.  *See Nat'l Rural Telecomms. Coop. v.*

1   *DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("In most situations, unless the

2   settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and

3   expensive litigation with uncertain results." (citation omitted)).

### 3. Risk of Maintaining Class Certification

5       The risk of maintaining class certification here is less than in putative class actions

6   because the Court already certified an overtime and meal-and-rest-break class.  Although

7   Freeman firmly believes that the Court's class certification decision was correct,

8   "'settlement avoids all possible risk' of later suffering the loss of all claims through

9   decertification."  (Final Approval Mem. at 11 (quoting *McKenzie v. Fed. Exp. Corp.*, No.

10  CV 10-02420 GAF PLAX, 2012 WL 2930201, at \*4 (C.D. Cal. July 2, 2012).)  Zillow

11  filed a motion to decertify and Rule 23(f) appeal on the meal-and-rest-break claims, which

12  would pose obstacles that Freeman would have to overcome to avoid a partial or complete

13  decertification of the class.  (*See id.*)  Accordingly, this factor therefore favors granting

14  final approval to the Settlement Agreement.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d

15  948, 966 (9th Cir. 2009) (finding that the risk of decertification "was not so minimal that

16  this factor could not weigh in favor of the settlement").

### 4. Amount Offered in Settlement

18      Assuming the Court grants the amount requested in fees, costs, and an incentive

19  award in full, the median settlement award would equal $3,480.36, a decrease from the

20  $5,974 predicted at the preliminary approval stage, while the mean would remain relatively

21  stable at $5,641.30 (excluding any requested incentive award for Freeman).  (Geragos

22  Suppl. Decl. ¶ 9, Doc. 148; Settlement Award Spreadsheet; Preliminary Approval Mem. at

23  9.)  The largest estimated payment under the Settlement Agreement (excluding any

24  incentive award) exceeds $31,000.  (*Id.*)  At the preliminary approval stage, Class Counsel

25  estimated the maximum potential recovery for class members' overtime claims based on

26  the number of class members, workweeks, assumed hours per week of unpaid overtime,

27  and a multiplier to account for liquidated damages and interest.  (Geragos Suppl. Decl. ¶¶

28  7, 10, Doc. 128-1.)  To support their estimate, Class Counsel noted that the Department of

1   Labor has authorized the Claims Administrator to send class members a Form WH-58

2   along with their settlement checks.  (*Id.* ¶ 8.)  The agency provides this form to employees

3   when an agreement provides "close to what it believes is 'full payment.'"  4 Emp. Coord.

4   Compensation § 41:8 (2017).  The maximum potential recovery on the meal-and-rest-

5   break claims was calculated based on an assumed one meal or rest break violation per

6   week.  (Geragos Suppl. Decl. ¶ 12.)  Plaintiff's expert had previously estimated that Zillow

7   employees forwent three meal or rest breaks per week, but Defendant's expert countered in

8   his rebuttal report that 80.9% of Zillow employees swiped back into the office between

9   11:00 a.m. and 2:00 p.m., potentially suggesting that Zillow employees took their meal

10  breaks roughly that fraction of each week.  (*Id.*)  Based on this evidence, Plaintiff's

11  Counsel asserted that an estimation of one meal or rest break violation per week is more

12  accurate, particularly because Zillow employees could have taken meal or rest breaks

13  without leaving the office or skipped the breaks voluntarily.  (*Id.*)  As for the California

14  penalty claims, Plaintiff's expert calculated $511,000 in damages for the waiting time

15  penalties, and Plaintiff's Counsel estimated the maximum potential liability for the wage-

16  statement claims based on an assumed $50 per initial pay period and $100 for each

17  subsequent period during the one-year limitations period.  (*Id.* ¶ 13.)  Plaintiff's Counsel

18  determined that they would not collect anything under the California Private Attorneys

19  General Act, because they did not comply with the statute's exhaustion requirement.  (*Id.* ¶

20  14.)  Class Counsel used the estimates of class members' maximum potential recovery to

21  conclude that class members would stand to recover nearly one hundred percent for the

22  first and second overtime allocations under the Settlement Agreement, while the recovery

23  would be less than ten percent for the waiting-time and wage-statement claims.  (*Id.* ¶ 5.)

24  Overall, the Settlement Agreement represents approximately 43% of class members'

25  maximum total potential recovery.  (*Id.*)  This percentage is comparable to, if not

26  somewhat greater than, the percentage recovered in other wage-and-hour settlements.  *See,*

27  *e.g.*, *Khanna v. Intercon Sec. Sys., Inc.*, No. 2:09-CV-2214 KJM EFB, 2014 WL 1379861,

28  at *12 (E.D. Cal. Apr. 8, 2014) (approving a settlement that reflected a recovery of 35% on

13

1   state overtime claims and 39% on FLSA claims); *Bellinghausen v. Tractor Supply Co.*, 303

2   F.R.D. 611, 623-24 (N.D. Cal. 2014) (finding a settlement amount equaling between 9%

3   and 27% of the total potential liability to be fair, adequate and reasonable given the

4   uncertainty of continued litigation); *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443,

5   456 (E.D. Cal. 2013) (approving a settlement agreement that amounted to approximately

6   30-57% of the maximum potential recovery); *Greko v. Diesel U.S.A., Inc.*, No. 10-CV-

7   02576 NC, 2013 WL 1789602, at *5 (N.D. Cal. Apr. 26, 2013) (finding settlement amount

8   that constituted 24% of estimated damages to be reasonable and beneficial to the class).

9     The distribution methodology for the net settlement fund also appears fair,

10   adequate, and reasonable.  Each class members' recovery under the Settlement Agreement

11   varies based on the length of their employment and the governing state law.  (*Id.* § 5.1.1.)

12   Thus, California class members' share of the net settlement fund will reflect the longer

13   statute of limitations for their overtime claims and their separate meal-and-rest-break,

14   waiting-time-penalty, and inaccurate-wage-statement claims.  *See In re Oracle Sec. Litig.*,

15   No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of

16   allocation that reimburses class members based on the extent of their injuries is generally

17   reasonable.").

18     Finally, the Settlement Agreement's release, though undoubtedly broad,

19   "appropriately track[s] the breadth of [Freeman's] allegations in the action[,] and the

20   settlement does not release unrelated claims that class members may have against

21   defendants."  *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 303 (E.D. Cal. 2011);

22   *see Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement

23   may preclude a party from bringing a related claim in the future even though the claim was

24   not presented and might not have been presentable in the class action, but only where the

25   released claim is based on the identical factual predicate as that underlying the claims in

26   the settled class action." (citation omitted)).  Courts routinely reject releases in wage-and-

27   hour agreements that, in form or effect, amount to a general release or a release of claims

28   unrelated to the plaintiff's complaint.  *See, e.g., Ambrosino v. Home Depot U.S.A, Inc.*, No.

11CV1319 L MDD, 2014 WL 1671489, at *2 (S.D. Cal. Apr. 28, 2014) (rejecting a general release); *McKeen-Chaplin v. Franklin Am. Mortg. Co.*, No. C 10-5243 SBA, 2012 WL 6629608, at *3 (N.D. Cal. Dec. 19, 2012) ("[O]verly broad release provisions, which release a [d]efendant from all claims to settle their wage claims, including claims that are unrelated to the claims asserted in the complaint, are improper in FLSA and class action settlements."). This Settlement Agreement neither includes a general release nor requires class members to waive claims unrelated to the allegations at issue in this action. (*See* SA First Amend. § 8.1.) And a broad release is understandable given the substantial monetary payout that class members will receive under the agreement. In addition, the potential breadth of the release has been narrowed by making the list of claims, theories, and documents listed in section 8.1 exhaustive and by adjusting the release period for Washington class members to correspond to the period for their allocations. (*See id.*)

Thus, the amount offered in settlement favors granting final approval to the Settlement Agreement.

### 5. Stage of the Proceedings and Extent of Discovery Completed

The stage of the proceedings and the extent of discovery are probative of whether "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Discovery can be both formal and informal. *See Clesceri v. Beach City Investigations & Protective Servs., Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011). Before reaching this Settlement Agreement, Class Counsel conducted a pre-suit investigation, reviewed thousands of pages of ESI documents, took a "double-digit" number of corporate witness depositions, defended the deposition of Freeman, and produced expert reports. (Final Approval Mem. at 12–13; Prelim. Mem at 19–20, Geragos Suppl. Decl. ¶¶ 9, 12, 15, Doc. 128-1; Geragos Second Suppl. Decl. ¶¶ 7, 14–15, Doc. 135.) After full briefing, the Court granted Freeman's hotly contested motion for class certification, and the parties commenced settlement discussions soon thereafter through a mediator. (Final Approval Mem. at 12.)

1   Given these facts, the Court concludes that the parties possess sufficient information
2   to make an informed settlement decision.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d
3   at 459 (finding plaintiffs had "sufficient information to make an informed decision about
4   the [s]ettlement" where formal discovery had not been completed but class counsel had
5   "conducted significant investigation, discovery and research, and presented the court with
6   documentation supporting those services.").  Accordingly, this factor weighs in favor of
7   granting final approval.

8   **6.  Experience and Views of Counsel**

9   "The recommendations of plaintiffs' counsel should be given a presumption of
10   reasonableness."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal.
11   2008) (citation omitted).  Class Counsel, who have extensive experience serving in
12   complex civil litigation, have endorsed the Settlement Agreement as fair, reasonable, and
13   adequate.  (Geragos Decl. ¶¶ 10–11, Doc. 122-2; Final Approval Mem. at 13.)  This factor
14   therefore supports final approval.

15   **7.  The Presence of a Governmental Participant**

16   "The participation of a governmental entity 'serves to protect the interest of the
17   class members.'"  *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862,
18   at *5 (N.D. Cal. Jan. 26, 2007) (quoting *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173,
19   1178 (9th Cir. 1977)).  DOL and Zillow have reached a separate agreement obligating
20   Zillow to pay its Inside Sales Consultants the 6.29 hours of overtime due under the main
21   FLSA allocation, which will be doubled to reflect liquidated damages, in return for DOL
22   authorizing the Claims Administrator to distribute copies of Form WH-58 along with the
23   settlement checks.  (Geragos Suppl. Decl. ¶ 7, Doc. 122-2.)  *See Walton v. United*
24   *Consumers Club, Inc.*, 786 F.2d 303, 306 (7th Cir. 1986) (explaining that DOL's response
25   to settlement agreements differs based on their quality).  The DOL's approval, at least in
26   part, of this Settlement Agreement militates in favor of granting final approval.

27
28

16

### 8.  Reaction of Class Members to Proposed Settlement

A small number of requests for exclusion and objections "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D.Cal.2004)).  Here, after the Court granted class members forty-five days to respond and the claims administrator reached ninety-eight percent of class members, no class members objected or requested to be excluded.  (Kierkegaard Decl. ¶¶ 14, 16, Doc. 145-1.) This strongly indicates that class members view this settlement favorably.

The declarations of current and former Zillow employees expressing favorable views about the Settlement Agreement buttress this conclusion.  Several former class members describe how the implementation of the Workday system allowed class members to accurately record their time and, more broadly, signaled a shift at Zillow to a workplace that better comported with state and federal labor laws.  (*See, e.g.*, Shokoohi Decl. ¶¶ 3–4; Simon Decl. ¶ 3; Murphy Decl. ¶ 3.)  Although current Zillow employees expressed support for their current employer, they do not suggest that the Settlement Agreement provides too little compensation or is otherwise unfair.  (Tyby Decl. ¶¶ 2–4; Cervinka Decl. ¶¶ 3–5.)  Accordingly, the lack of any objections or opt-outs and the declarations of class members strongly support final approval of this Settlement Agreement.

### 9.  Signs of Collusion

This Settlement Agreement contains a clear-sailing provision that prevents Zillow from objecting to a request for attorneys' fees of up to one third of the gross settlement fund ($2,000,000).  (SA § 5.1.3.)  Although a clear-sailing provision "increases the likelihood that class counsel will have bargained away something of value to the class[,]" *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 948 (citation omitted), it is not fatal to approval of a class action settlement, particularly where the agreement lacks a "kicker" provision that returns all unawarded attorneys' fees to the defendant.  *See, e.g.*, *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295

1  F.R.D. 438, 458 (C.D. Cal. 2014) ("The absence of a 'kicker provision' in the parties'

2  settlement and the fact that the class is receiving reasonable value reduces the likelihood

3  that plaintiffs and [defendant] colluded to confer benefits on each other at the expense of

4  class members.").  The Settlement Agreement provides that the Court will determine the

5  final amount awarded in attorneys' fees and an incentive award, and any unawarded sums

6  will remain part of the net settlement fund.  (SA §§ 2.21, 5.1, 5.1.3.)  Further suggesting

7  that this agreement is not collusive, the parties negotiated the agreement with the

8  assistance of an experienced magistrate judge.  (Geragos Decl. ¶ 10, Doc. 122-2.)  *See*

9  *Satchell v. Fed. Express Corp.*, No. C 03-2879 SI, 2007 WL 1114010, at *4 (N.D. Cal.

10  Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process

11  confirms that the settlement is non-collusive.").

12      **C.**  **Conclusion as to Final Approval of the Settlement**

13       Considering all of the factors together, the Court concludes that the settlement is

14  fair, reasonable, and adequate.  Accordingly, the Court GRANTS Plaintiff's Motion for

15  Final Approval of the Class Action Settlement.

16  **IV.**      **SETTLEMENT ADMINISTRATOR COSTS**

17       The Settlement Agreement provides that Garden Group City's claims

18  administration expenses shall not exceed $60,000.  (SA § 5.1.)  After the Court requested

19  information about the claim administration expenses, Class Counsel submitted a

20  supplemental declaration from the claims administrator attesting that it charged a flat fee

21  of $40,000 for distributing the class notice to the 690 class members, operating the toll-free

22  number, and maintaining the class website.  (Kierkegaard Suppl. Decl. ¶ 4, Doc. 148-10;

23  Garden Group Billing Records, Exh. A, Doc. 148-10.)  The claims administrator

24  anticipates another $7,500 in fees to perform the necessary tax calculations for claims

25  distributions.  (Kierkegaard Suppl. Decl. ¶ 4.)  The Court concludes that the $47,500

26  requested in claims administration fees is reasonable under the circumstances and

27  GRANTS the Motion as to this payment.

28

# V.    **ATTORNEYS' FEES**

Rule 23 permits a court to award "reasonable attorneys' fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *In re Bluetooth Headset Prods.*, 654 F.3d at 941.  In the Ninth Circuit, the benchmark for a fee award in common fund cases is 25% of the recovery obtained.  *See id.* at 942 ("Where a settlement produces a common fund for the benefit of the entire class, . . . courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record for any 'special circumstances' justifying a departure.").  Courts must "justify any increase or decrease from this amount based on circumstances in the record."  *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 455 (E.D. Cal. 2013) (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).  The Ninth Circuit has identified a number of factors the Court may consider in assessing whether an award is reasonable, including: (1) the results achieved, (2) the risk of litigation, (3) the skill required and quality of work, and (4) the contingent nature of the fee and the financial burden carried by the plaintiff.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).  Counsel's lodestar may also "provide a useful perspective on the reasonableness of a given percentage award."  *Id.* at 1050.

Class Counsel seek an attorneys' fees award of $1,965,311.49, which amounts to slightly less than one-third of the Gross Settlement Fund, and costs of $34,688.51.[2]  (Fees Mem. at 1.)  For the following reasons, the Court agrees that an upward departure from the

---

[2] The Court rejects Class Counsel's request to calculate attorneys' fees based on their lodestar as opposed to the percentage-of-recovery approach.  In the Ninth Circuit, "district court[s] ha[ve] discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method."  *Vizcaino*, 290 F.3d at 1047.  *Accord In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 942.  Where the relief obtained is primarily monetary, this Court generally employs the percentage-of-recovery method because it better aligns the interests of Class Counsel with those of class members and can be more readily calculated.  *See In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 590 (N.D. Cal. 2015).

1  benchmark is appropriate but will limit the award to thirty percent of the common fund

2  ($1,800,000).

3      **A.**    <u>**Results Achieved**</u>

4          Class Counsel represent that they have obtained "an exceptional result" despite

5  "significant risk." (Fee Mem. at 21.) The Settlement Agreement accounts for more than

6  forty percent of Zillow's maximum potential liability, and class members' individual

7  settlement awards are quite substantial, with the median settlement check equaling

8  $3,480.36 and the mean award totaling $5,641.30. (Geragos Suppl. Decl. ¶ 9, Doc. 148;

9  Settlement Award Spreadsheet.) Class Counsel also highlight the risks they had to

10  navigate while negotiating this Settlement Agreement—in particular, Zillow's Rule 23(f)

11  appeal and its motion for summary judgment. (Fee Mem. at 21.)

12          Undoubtedly, one reason that the individual checks are quite substantial is that this

13  Settlement Agreement focuses on overtime claims, which involve much greater potential

14  liability than meal-and-rest-break violations. Yet substantial credit must be given to Class

15  Counsel, who successfully overcame setbacks, such as the Court granting Zillow's Motion

16  to Dismiss twice, and obtained certification of both an overtime and meal-and-rest-break

17  class. To succeed, Class Counsel needed considerable fact discovery, expert testimony, an

18  understanding of Rule 23, and a tenacity in the face of numerous obstacles. The

19  percentage of Zillow's maximum potential liability recovered here also compares

20  favorably to other wage-and-hour settlement agreements. In *Ruiz v. JCP Logistics, Inc.*,

21  for example, this Court recognized that that a "39.65% recovery is . . . higher than the

22  typical range of accepted recoveries" in wage-and-hour litigation and awarded thirty

23  percent of the common fund in attorneys' fees. No. SACV-13-1908-JLS-ANx, 2016 WL

24  6156212, at *8 (C.D. Cal. Aug. 12, 2016); *see also Greko v. Diesel U.S.A., Inc.*, No. 10-

25  CV-02576 NC, 2013 WL 1789602, at *5 (N.D. Cal. Apr. 26, 2013) (24% recovery); *Selk*

26  *v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1175 (S.D. Cal. 2016)

27  (approving collective action settlement "between 26% to 50% of the best possible

28  recovery"). *But see Goodwin v. Winn Mgmt. Grp. LLC*, No. 115CV00606DADEPG, 2017

WL 3173006, at *10 (E.D. Cal. July 26, 2017) (63% of the total potential liability). Accordingly, the results achieved by Class Counsel in this relatively complex wage-and-hour case strongly favor an upward departure from the twenty-five percent benchmark.

## B.   Risk of Litigation

In bringing this suit, Class Counsel faced numerous obstacles, such as framing the complaint in a manner that could be certified as a collective and class action, marshalling the evidence necessary to support class certification, and persuading the Court that class certification was appropriate.  Counsel identify numerous risks attendant with continuing to litigate this case:  Zillow's Rule 23(f) petition, summary judgment motion, and decertification motion.  (Fee Mem. at 21.)  Each of these hurdles increased the risk that Class Counsel would receive no compensation for their years of prosecuting this suit.  *See Vandervort*, 8 F. Supp. 3d at 1209 (justifying upward departure, in part, by noting an interlocutory appeal of the class certification order).  As such, this factor justifies an upward departure from the twenty-five percent benchmark.

## C.   Skill Required and Quality of Work

This case involved substantial motion practice and complex work, such as two motions to dismiss, extensive fact and expert discovery, a fiercely contested motion for class certification, a Rule 23(f) appeal granted by the Ninth Circuit, and a pending summary judgment and decertification motion.  Courts have recognized that an upward departure may be appropriate where Class Counsel have performed "extensive legal research and analysis," "interviewed other employees," analyzed "voluminous payroll and timekeeping data," and conducted "extensive motion practice," *Bautista v. Harvest Mgmt. Sub LLC*, No. CV1210004FMOCWX, 2014 WL 12579822, at *12 (C.D. Cal. July 14, 2014); *In re Heritage Bond Litig.*, No. 02-ML-1475-DT(RCX), 2005 WL 1594389, at *10 (C.D. Cal. June 10, 2005).  As this was certainly the circumstance here, this factor favors departing upward from the twenty-five percent benchmark as well.

### D.   Contingent Nature of the Fee

Class Counsel expended 2,987.79 total hours litigating this case through the filing of the Motion for Preliminary Approval in December 2016.  During the past three years, Counsel have received no compensation for their efforts on behalf of class members. Although a contingency agreement does not alone justify an upward departure from the benchmark, *see, e.g.*, *Clayton v. Knight Transp.*, 1:11-cv-00735-SAB, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013), when combined with other considerations that would warrant an upward departure, it can be "an important factor in determining the fee award and may justify awarding a premium . . . ."  *Monterrubio*, 291 F.R.D. at 457 (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994)).  As noted already, this suit involved a favorable recovery despite unusually high risks and complexity, so the contingent nature of the fee justifies an upward departure from the twenty-five percent benchmark.

In sum, the Court believes that the very favorable recovery for class members, the risk attendant with prosecuting this action, and the extensive discovery and motion practice justify a significant upward departure from the Ninth Circuit's twenty-five percent benchmark.  Yet, because this case was resolved before Zillow's decertification and summary judgment motions, its Rule 23(f) appeal, or trial, the Court declines to award nearly one third of the common fund in attorneys' fees.  Accordingly, the Court finds a fee award of thirty percent, or $1,800,000, reasonable under the circumstances.  *See Ruiz*, 2016 WL 6156212, at *10.

### E.   Lodestar Cross-Check

As a cross-check on the reasonableness of a fee award, courts may compare the requested percentage of the common fund with the counsel's lodestar calculations. *Vizcaino*, 290 F.3d at 1050–51.  Class Counsel submit billing records indicating that they have spent 2,987.79 hours[3] litigating this action through the filing of their motion for

---

[3] The hours included on Counsel's excel spreadsheet summed to 1.2 hours less than the total provided by Counsel in their Memorandum.  (*See* Mem. at 13.)

preliminary approval.  (*See* Billing Records, Doc. 143.)  Class Counsel has calculated a lodestar by multiplying the hours billed by the proposed hourly rates for each practitioner. (*Id.*; Expense List, Exh. A, Doc. 49-5, Expense List, Exh. B, Doc. 49-6.)

The lodestar cross-check first requires the court to determine whether the hourly rates sought by counsel are reasonable.  "[T]he district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  This determination "is not made by reference to rates actually charged [by] the prevailing party." *Id*.  The fee applicant bears the burden of showing that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 980 (9th Cir. 2008) (citation omitted).  "Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp*., 896 F.2d 403, 407 (9th Cir. 1990).  A court may also "rely on its own familiarity with the legal market." *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  As a general rule, the forum district represents the relevant legal community. *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).  "[I]n contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours" *Georgino v. Sur la Table, Inc.*, No. CV-11-03522-MMM-JEMX, 2013 WL 12122430, at *22 (C.D. Cal. May 9, 2013) (quoting *Young v. Polo Retail, LLC*, No. C 02 4546 VRW, 2007 WL 951821, at *6 (N.D. Cal. Mar. 28, 2007)).

Class Counsel have billed their time at the following rates:

23

| Practitioner | Years of Experience | Proposed Rate | *Laffey* Locality-Adjusted Index Rate |
|---|---|---|---|
| M. Geragos | 34 | $1,750 | $842.52 |
| B. Meiselas | 6 | $850 | $429.42 |
| S. Qassim | 5 | $650 | $429.42 |
| Z. Muljat | 3 | $550 | $349.86 |
| T. Ross | 4 | $650 | $429.42 |
| G. Kirakosian | 2 | $650 | $429.42 |
| C. Aronson | 2 | $350 | $349.86 |
| D. Rossi | 3 | $350 | $349.86 |
| D. Darwish | 2 | $350 | $349.86 |
| J. Vasquez | 3 | $350 | $349.86 |
| H. Kuyumjian | 9 | $650 | $620.16 |
| B. Samini | 21 | $850 | $842.52 |
| M. Hoesly | 4 | $495 | $429.42 |
| L. Booth | 22 | $650 | $842.52 |
| J. Whelan | 23 | $695 | $842.52 |
| C. Stark | 2 | $295 | $349.86 |
| G. Petersen | 40 | $650 | $842.52 |
| K. Morisseau | 4 | $375 | $429.42 |
| Law Clerk | 0 | $200 | N/A |

(Fee Mem. at 12–18; Geragos Decl. ¶¶ 23–26.)  If the Court were to use the cost-of-living adjusted *Laffey* Index rates that Class Counsel provide, Class Counsel's lodestar would decrease to $1,369,051.47.  (Fee Mem. at 18.)

Class Counsel has not provided sufficient support for its proposed hourly rates. Much of Class Counsel's explanation of why its proposed hourly rates are reasonable consists of *Laffey* Index calculations.  (Fee Mem. at 14–18.)  But, quite obviously, relying

24

1    on the *Laffey* Index would only support a *Laffey* rate, not those proposed by Class Counsel.

2    The only other support Class Counsel provide for its proposed rates is a string cite to other

3    cases that reveals the same disconnect between the rates proposed and those approved by

4    other courts.  (*See* Mem. 14.)  For instance, a case that approved a rate of $750 per hour,

5    *see Rutti v. Lojack Corp.*, No. SACV 06-350 DOC JCX, 2012 WL 3151077, at *11 (C.D.

6    Cal. July 31, 2012), does not support a rate of $850 per hour.  Likewise, a $900 rate for a

7    lawyer who had developed extensive complex litigation experience over his thirty-nine-

8    year-long career, *see Orian v. Fed'n Int'l des Droits de L'Homme*, No. CV 11-6904 PSG

9    FFMX, 2012 WL 994643, at *3 (C.D. Cal. Mar. 22, 2012), would not support a rate of

10    $1,750 per hour.  Finally, Class Counsel have not identified other cases where district

11    courts approved Class Counsel's requested hourly rates or provided declarations detailing

12    the qualifications of each practitioner.  Thus, because Class Counsel have not provided the

13    necessary evidence to support their requested rates, the Court will use the *Laffey* Index

14    rates that Class Counsel devote substantial attention to in their Fee Memorandum.

15       Class Counsel's billing records reveal that Class Counsel billed 2,987.79 hours on

16    this case through December 2, 2017.  (Billing Records, Exh. 1, Doc. 143-1.)  Class

17    Counsel's billing activities include researching the applicable labor law, drafting the class

18    action complaint, writing two oppositions to the motions to dismiss, drafting amended

19    complaints to remedy the deficiencies identified in the motion to dismiss orders,

20    propounding written discovery, conducting document review, responding to discovery

21    requests, resolving discovery disputes, drafting a class certification motion and reply,

22    taking depositions, participating in mediation, and preparing the Settlement Agreement.

23    (Billing Records, Exh. 1.)

24       Based on the numbers provided in the fee petition, a thirty percent award would

25    imply a lodestar multiplier of 1.31, which is an appropriate multiplier and confirms the

26

27

28

1  reasonableness of the fee award.[4]

2  ## VI.  LITIGATION COSTS

3  Plaintiffs request that the Court approve the reimbursement of $34,688.51 in

4  counsel's litigation expenses and costs.  (Fee Mem. at 23.)  "Attorneys may recover their

5  reasonable expenses that would typically be billed to paying clients in non-contingency

6  matters."  *In re Omnivision*, 559 F. Supp. 2d at 1048.  Such costs may include "travel

7  costs, mediation fees, expert fees, copy and scanning costs, filing fees, and electronic

8  research fees."  *Franco v. Ruiz Food Prod., Inc.*, No. 1:10-CV-02354-SKO, 2012 WL

9  5941801, at *22 (E.D. Cal. Nov. 27, 2012).  The Court does not award the $3,000

10 requested for future expenses because Class Counsel provide no information as to why or

11 for what reason they anticipate incurring these expenses.  (*See* Fee Mem. at 25.)  As for the

12 actual expenses, the Court deducts one item that lacks a description ($416.73), another

13 where Class Counsel do not provide the necessary information to support the unusual

14 claimed expense ("Jet Fuel," $837.12), and a meal reimbursement that is too high,

15 considering that the expense records provide no information about the number of attorneys

16 present ("San Franciscan, San Francisco, CA," $1,658.98).  (*See* Expense Records, Exh. 1,

17 Doc. 143-1.)  The Court finds the other expenses reasonable and adequately documented

18 and GRANTS the Motion as to Class Counsel's request for $28,775.68 in litigation costs.

19 ## VII.  SERVICE AWARD

20 Finally, Freeman seeks a service award of $15,000.  (Fee Mem. at 24.)  Service

21 awards are "discretionary . . . and are intended to compensate class representatives for

22 work done on behalf of the class, to make up for financial or reputational risk undertaken

23 in bringing the action, and, sometimes, to recognize their willingness to act as a private

24 _____

25 [4] At the fairness hearing, Counsel noted that the two Plaintiff's firms expended a
26 significant number of hours after their Motion for Preliminary Approval.  But the two rounds of supplemental briefing and amendments to the Settlement Agreement that occurred after the
27 Motion for Preliminary Approval addressed rather obvious concerns with the Settlement Agreement that could have been avoided through a more comprehensive initial brief and a more
28 careful review of the case law before finalizing the agreement.  These additional hours, therefore, do not warrant an upward adjustment.

1   attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009)

2   (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)).  "To [further]

3   assess whether an incentive payment is excessive, district courts balance 'the number of

4   named plaintiffs receiving incentive payments, the proportion of the payments relative to

5   the settlement amount, and the size of each payment.'"  *Monterrubio*, 291 F.R.D. at 462

6   (quoting *Staton*, 327 F.3d at 977).  Courts "must 'evaluate [such] awards individually' to

7   detect 'excessive payments to named class members' that may indicate 'the agreement was

8   reached through fraud or collusion.'"  *Id.* (quoting *Staton*, 327 F.3d at 975, 977).

9        Here, Freeman submits a declaration affirming that he was an active participant at

10   every stage of this litigation.  Freeman provided Class Counsel with the basis for the

11   complaint, sat for a full-day deposition, assisted with written discovery, communicated

12   with fellow class members, and attended a day-long mandatory settlement conference

13   before a magistrate judge.  (Freeman Decl. ¶¶ 3–6, Doc. 143-2.)  Freeman further attests

14   that he has "incur[red] a certain stigma, which may have had, or in the future will have, an

15   adverse effect on my employment prospects."  (*Id.* ¶ 8.)  He cites a specific instance where

16   he received an offer from an employer only to have it retracted after the employer

17   discovered his involvement in this wage-and-hour action.  (*Id.* ¶ 7.)

18        While the requested incentive award is undoubtedly high, the Court finds Freeman's

19   requested incentive award is reasonable under these atypical circumstances.   Freeman's

20   requested award is only 4.3 times the median award, 0.25 percent of the gross settlement

21   fund, and less than Freeman's standard award under the Settlement Agreement.  (Geragos

22   Suppl. Decl. ¶ 9.)  With the incentive award, Freeman's combined settlement proceeds

23   ($32,842.24) only slightly exceed the largest unnamed class member award under the

24   Settlement Agreement ($31,374.94).  (*Id.*)  *See Syed v. M-I, LLC*, No. 1:12-CV-01718-

25   DAD-MJS, 2017 WL 3190341, at *9 (E.D. Cal. July 27, 2017) (approving of a $15,000

26   and $20,000 award in a wage-and-hour class action partly because of the class members'

27   high average recovery); *Ontiveros v. Zamora*, 303 F.R.D. 356, 366 (E.D. Cal. 2014)

28   (approving of a $15,000 incentive award where the average settlement amount was

1   $3,700).  Other class members, who stand to receive a considerable amount under the

2   agreement, did not have to incur the significant reputational stigma or discovery burdens

3   associated with agreeing to be a named plaintiff.  *See In re Toys R Us-Delaware, Inc.—*

4   *Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 470 (C.D. Cal.

5   2014) ("When a class representative shoulders some degree of personal risk in joining the

6   litigation, such as workplace retaliation or financial liability, an incentive award is

7   especially important."); *Navarro v. Servisair*, No. C 08-02716 MHP, 2010 WL 1729538, at

8   *4 (N.D. Cal. Apr. 27, 2010) (granting a $10,000 incentive award where the class

9   representative attended a deposition and mediation and placed himself in "a financially

10   vulnerable position" by "agree[ing] to lend[] his name to a lawsuit against a . . . former

11   employer").  Freeman's anecdote about an employer that withdrew an offer after learning

12   about this litigation underscores how tangible the stigma can be.  (*See* Freeman Decl. ¶ 7.)

13   And, not only did Freeman incur far more risk, but Freeman's release under the Settlement

14   Agreement is broader than the one applicable to unnamed class members.  (SA § 8.5.)

15   Finally, Freeman was an active participant in this action, attending a day-long deposition

16   and mandatory settlement conference, working with Class Counsel to develop the class

17   complaint, and communicating by phone, social media, and email with other class

18   members about the action.  (Freeman Decl. ¶¶ 3–6.)  A higher incentive award would

19   appropriately compensate Freeman for the effort he expended in furtherance of this

20   litigation.

21        Thus, after considering Freeman's contributions to this settlement, the size of the

22   award in relation to the total common fund, the amount recovered by unnamed class

23   members, and the substantial reputational risk incurred in bringing this suit, the Court

24   concludes that the requested $15,000 incentive award is appropriate.

25   **VIII.  <u>CONCLUSION</u>**

26        The Court finds the settlement to be fair, adequate, and reasonable, and accordingly

27   GRANTS final approval of the settlement.  The Court also GRANTS Plaintiff's motion for

28   attorneys' fees, costs, and a service payment, with certain modifications.  The Court

1 awards Class Counsel $1,800,000 in attorneys' fees, based on an award of 30% of the

2 gross settlement fund, and $28,775.68 in costs.  The Court also awards a service payment

3 of $15,000 to Plaintiff Freeman.  Finally, the Court awards $47,500 in administrative

4 expenses to Garden City Group, LLC.  Distribution of the settlement fund to claimants

5 shall be made in accordance with the method outlined in the Settlement Agreement.

6          Plaintiff shall file a proposed judgment forthwith.

7

8

9 DATED: October 03, 2017

10                                              JOSEPHINE L. STATON
                                                UNITED STATES DISTRICT JUDGE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28